FISHER, Appellant,

v.

ALLIANCE MACHINE COMPANY et al., Appellees.

[Cite as *Fisher v. Alliance Machine Co.,* 192 Ohio App.3d 90, 2011-Ohio-338.]

Court of Appeals of Ohio,
Eighth District, Cuyahoga County.

No. 94836.

Decided Jan. 27, 2011.

Goldberg, Persky & White, P.C., Joseph J. Cirilano, Charles J. McLeigh, Mark C. Meyer, Diana Nickerson Jacobs, and David B. Rodes; and John J. Duffy & Associates and John J. Duffy, for appellant.

John A. Valenti, for appellees Arthur Louis Supply Company.

John A. Kristan Jr.; and Kelley, Jasons, McGowan, Spinelli & Hanna, W. Matthew Reber, and Robert N. Spinelli, for appellees Clark Industrial Insulation Company.

MARY J. BOYLE, Judge.

{¶ 1} Appellant, Eugene Fisher Jr., for the estate of plaintiff, Eugene Fisher Sr. ("Fisher"), appeals from a judgment granting summary judgment in favor of defendants-appellees, Arthur Louis Supply Company ("A. Louis") and Clark Industrial Insulation Company ("Clark"). In this appeal, the estate contends that the trial court erred by granting summary judgment to A. Louis and Clark. After a thorough review of the record, we affirm with respect to Clark, but reverse with respect to A. Louis.

{¶ 2} Fisher worked as an electrician at Reactive Metals, Inc., from September 16, 1957, to June 14, 1963, where his estate claims he was exposed to asbestos products supplied by A. Louis and Clark. He developed mesothelioma from his exposure to asbestos and filed a complaint on June 6, 2006, against numerous entities, including A. Louis and Clark, for damages arising from his disease. Fisher died on June 21, 2006, just over two weeks after he filed his complaint. His son was substituted as plaintiff in the case.

{¶ 3} A. Louis and Clark moved for summary judgment, arguing that Fisher's estate did not present any competent evidence that he was exposed to asbestos from products they supplied during his employment with Reactive Metals. They further argued that even if the court found that there was sufficient evidence to create genuine issues of fact that Fisher was exposed to their products during the relative time period, Fisher's estate still did not establish that these products were a substantial factor in causing Fisher's mesothelioma.

{¶ 4} The trial court granted both summary-judgment motions, finding that Fisher's estate failed to produce any evidence that Fisher was exposed to any products supplied by A. Louis or Clark and that it failed to produce evidence that exposure to asbestos products supplied by A. Louis or Clark were a substantial

factor in causing his mesothelioma. It is from these judgments that Fisher's estate appealed.

{¶ 5} Appellate review of summary judgment is de novo, governed by the standard set forth in Civ.R. 56. *Comer v. Risko*, 106 Ohio St.3d 185, 2005-Ohio-4559, 833 N.E.2d 712, ¶ 8. Accordingly, we afford no deference to the trial court's decision and independently review the record to determine whether summary judgment is appropriate. *Hollins v. Shaffer*, 182 Ohio App.3d 282, 2009-Ohio-2136, 912 N.E.2d 637, ¶ 12.

{¶ 6} As in any case, summary judgment is appropriate in an asbestos case "when, looking at the evidence as a whole, (1) no genuine issue of material fact remains to be litigated, (2) the moving party is entitled to judgment as a matter of law, and (3) it appears from the evidence, construed most strongly in favor of the nonmoving party, that reasonable minds could only conclude in favor of the moving party." Civ.R. 56; *Horton v. Harwick Chem. Corp.* (1995), 73 Ohio St.3d 679, 653 N.E.2d 1196, paragraph three of the syllabus.

## Asbestos Law

{¶ 7} The Ohio Supreme Court has held that "[f]or each defendant in a multidefendant asbestos case, the plaintiff has the burden of proving exposure to the defendant's product and that the product was a substantial factor in causing the plaintiff's injury." *Horton*, paragraph one of the syllabus. In *Horton*, the Supreme Court adopted the definition of "substantial factor" in Restatement of the Law 2d, Torts (1965), Section 431, Comment a:

{¶ 8} "The word 'substantial' is used to denote the fact that the defendant's conduct has such an effect in producing the harm as to lead [a reasonable person] to regard it as a cause, using that word in a popular sense, in which there always lurks the idea of responsibility, rather than the so-called 'philosophical sense,' which includes every one of the great number of events without which any happening would not have occurred." Id. at 686.

{¶ 9} Fisher's estate cites *Horton* to support what it claims a plaintiff needs to prove regarding "substantial factor." Specifically, it quotes paragraph two of the *Horton* syllabus, where the Ohio Supreme Court explicitly "disapproved" the "frequent-proximity" test set forth in *Lohrmann v. Pittsburgh Corning Corp.* (C.A.4, 1986), 782 F.2d 1156. In paragraph two of the *Horton* syllabus, the Supreme Court held that "[a] plaintiff need not prove that he was exposed to a specific product on a regular basis over some extended period of time in close proximity to where the plaintiff actually worked in order to prove that the product was a substantial factor in causing his injury."

{¶ 10} But Fisher's estate fails to acknowledge that "[t]he General Assembly effectively overruled paragraph two of the syllabus to *Horton* with the adoption

of R.C. 2307.96(B), effective to cases filed on or after September 2, 2004." *Vince v. Crane Co.*, 8th Dist. No. 87955, 2007-Ohio-1155, 2007 WL 766114, fn. 3. Since this case was filed in 2006, R.C. 2307.96(B) is applicable. Thus, this provision sets forth Fisher's estate's burden in establishing that each defendant's product was a substantial factor in causing Fisher's mesothelioma. It provides:

{¶ 11} "(B) A plaintiff in a tort action who alleges any injury or loss to person resulting from exposure to asbestos has the burden of proving that the plaintiff was exposed to asbestos that was manufactured, supplied, installed, or used by the defendant in the action and that the plaintiff's exposure to the defendant's asbestos was a substantial factor in causing the plaintiff's injury or loss. In determining whether exposure to a particular defendant's asbestos was a substantial factor in causing the plaintiff's injury or loss, the trier of fact in the action shall consider, without limitation, all of the following:

{¶ 12} "(1) The manner in which the plaintiff was exposed to the defendant's asbestos;

{¶ 13} "(2) The proximity of the defendant's asbestos to the plaintiff when the exposure to the defendant's asbestos occurred;

{¶ 14} "(3) The frequency and length of the plaintiff's exposure to the defendant's asbestos;

{¶ 15} "(4) Any factors that mitigated or enhanced the plaintiff's exposure to asbestos."

{¶ 16} In adopting R.C. 2307.96(B), the General Assembly explained:

{¶ 17} "It is the intent of the General Assembly in enacting section 2307.96 of the Revised Code in this act to establish specific factors to be considered when determining whether a particular plaintiff's exposure to a particular defendant's asbestos was a substantial factor in causing the plaintiff's injury or loss. The consideration of these factors involving the plaintiff's proximity to the asbestos exposure, frequency of the exposure, or regularity of the exposure in tort actions involving exposure to asbestos is consistent with the factors listed by the court in *Lohrmann v. Pittsburgh Corning [Corp.]* (4th Cir.1986), 782 F.2d 1156. The General Assembly by its enactment of those factors intends to clarify and define for judges and juries that evidence which is relevant to the common law requirement that plaintiff must prove proximate causation. It recognizes this section's language is contrary to the language contained in paragraph 2 of the syllabus of the Ohio Supreme Court in [*Horton* ]. * * * The *Lohrmann* standard provides litigants, juries, and the courts of Ohio an objective and easily applied standard for determining whether a plaintiff has submitted evidence sufficient to sustain plaintiff's burden of proof as to proximate causation. Where specific evidence of frequency of exposure, proximity and length of exposure to a

particular defendant's asbestos is lacking, summary judgment is appropriate in tort actions involving asbestos because such a plaintiff lacks any evidence of an essential element necessary to prevail. To submit a legal concept such as a 'substantial factor' to a jury in these complex cases without such scientifically valid defining factors would be to invite speculation on the part of juries, something that the General Assembly has determined not to be in the best interests of Ohio and its courts." Section 5, 150 Ohio Laws, Part III, 3970, 3992.

## Deposition Testimony

{¶ 18} At the outset, A. Louis and Clark argue that Fisher's deposition cannot be considered for purposes of summary judgment, because they had not been served with process at the time he was deposed and therefore they did not have the opportunity to cross-examine him.

{¶ 19} Fisher testified by video deposition on June 9, 2006, while under the care of hospice. Nearly 20 attorneys, each representing a different defendant, were present at the deposition. Fisher's counsel stipulated prior to the deposition and on the record that all objections would be preserved for the record to ensure that the deposition was completed efficiently. Fisher's counsel further represented that he would not ask Fisher any defendant-specific asbestos product identification, which meant that he would ask Fisher only about his exposure to "generic asbestos products." And of the nearly 20 attorneys present at the deposition, only three cross-examined Fisher, and those examinations were *very brief;* the cross-examination took up five pages of the 48–page transcript. We therefore find that A. Louis and Clark were not prejudiced in any way by not being present at Fisher's deposition.

{¶ 20} Fisher worked as an electrician at Reactive Metals from 1957 to 1963. He then worked at Cabot Titania for a short time, until he obtained employment as an electrician at Packard Electric in Warren, Ohio, where he worked until he retired in 1997.

{¶ 21} Fisher testified that at Reactive Metals, he worked alongside pipefitters throughout the plant. He explained that heated pipes carrying sodium were insulated with asbestos insulation. Electricians were directly involved with this process because they were responsible for placing cal-rods, or heating elements, on the insulation to keep the pipes heated and the sodium flowing. At that time, they did not have asbestos insulation that would fit around the "elbows" of the pipes, so the pipefitters would take chunks of asbestos and place it in five-gallon buckets to make a paste-like substance to put around the elbows of the pipes. Anytime the pipefitters had to place new asbestos insulation around the pipes, Fisher said, there was dust everywhere.

{¶ 22} Fisher also explained that he was around pipefitters when they cut asbestos gaskets. Pipefitters had to cut gaskets by hand because they were odd sizes. When asked, "Were you throughout the plant, around [pipefitters], when they were working with gaskets," Fisher replied, "Probably 90% of the time."

{¶ 23} Fisher further agreed that he was familiar with packing material used around valves and pumps, and that it was throughout the plant. Fisher said that he was also around millwrights when they were welding and used asbestos blankets to prevent fire, and he worked in and around furnaces where asbestos blankets were used to insulate the furnaces.

{¶ 24} Dennis Songer testified that he began working at Reactive Metals in 1957 with Fisher. At that time, Reactive Metals had just built that facility. Songer was also an electrician, and worked side by side with Fisher. Songer estimated that there were about 14 electricians, and they all worked together.

{¶ 25} Songer testified that electricians worked side by side with the pipefitters and sometimes the millwrights. He explained that the electricians worked directly with the asbestos insulation on the pipes because they had to replace the cal-rods, which heated the pipes. He further described that the pipefitters would place the insulation on the pipes, creating a lot of dust that they all breathed. Then the electricians would wrap the cal-rod over the insulation on the pipes. Sometimes, the electricians had to pull the insulation off to replace the cal-rods, which also created a lot of dust. The electricians also removed insulation on filters to place new heating elements on "vessels."

{¶ 26} Songer also explained that he recalled seeing boxes of half-piece J.M. pipe insulation. He further recalled a brand name of Garlock, but stated, "I can't remember what it was. I think it was kind of like a rope affair." Songer said that the pipefitters used it around "valves and things," and said that Fisher would have been around whatever the pipefitters were working on.

{¶ 27} Songer further testified that the electricians worked around asbestos blankets that were placed on the furnaces that heated the reactors where the metals were made. The electricians placed the cal-rods that heated the pipes attached to the reactors.

{¶ 28} John Gozzard testified that he also began working at Reactive Metals in 1957 and retired from there after 33 years. He explained that in 1960, Reactive Metals had 500 or 600 employees. He worked in the storeroom during the years Fisher worked there. He was responsible for working the window, handing out materials, and receiving materials. He explained that the two-story storeroom was located in the middle of the building, next to the electrician shop. On the other side of the electrician shop was the machine shop, and next to the machine

shop was the pipefitter shop. The storeroom was enclosed, but the "shops" were all open.

{¶ 29} Gozzard said that there was a tremendous amount of piping in the plant, thousands of feet of piping, which was all covered with asbestos insulation. Gozzard explained that most of the asbestos insulation in the storeroom was left over from the construction of the plant, but he did not know who had supplied it.

{¶ 30} Gozzard testified that Fisher would come to the storeroom three or four times a day to get wiring or electrical parts, but said he never gave Fisher any asbestos products. The wiring was stored on the second floor of the storeroom, where blanket asbestos, asbestos sheet gasket, and asbestos pipe insulation were kept. Pipefitters were the ones who used the asbestos sheet gasket material, which they cut in the pipefitter shop. The electricians, who were responsible for replacing cal-rods, worked directly with the pipefitters.

{¶ 31} Gozzard recalled that the asbestos pipe insulation and asbestos gaskets were manufactured by Johns Manville ("J.M."). He said that F.B. Wright supplied most of the J.M. pipe insulation to Reactive Metals. He further explained that F.B. Wright supplied most of the asbestos products to Reactive Metals, including gaskets, blankets, gloves, and packing. He recalled that Reactive Metals also received asbestos packing from Trumbull Supply. And it had asbestos tubing and block insulation in the plant, but he could not recall who supplied it.

{¶ 32} Gozzard testified that A. Louis supplied asbestos gaskets and braided asbestos packing to RMI during the years Fisher worked there. He estimated that A. Louis supplied 10 to 15 percent of the gaskets and packing material to Reactive Metals. But he said that A. Louis was only a backup supplier. Gozzard explained that he knew the gaskets contained asbestos because they had a tag on them that said "asbestos," and they were bundled in groups of 25, marked with "Johns Manville." He stated that the invoices from A. Louis also said "asbestos gaskets." He estimated that Reactive Metals purchased about 100 gaskets from A. Louis. And he agreed that A. Louis supplied only precut gaskets. According to Gozzard, Reactive Metals also purchased asbestos packing material from A. Louis, but he agreed that such purchases were infrequent. He did not know who manufactured the packing material that A. Louis supplied, because it was not labeled. But he explained that it came in boxes of one-pound or five-pound spools. He further explained that although it was not marked, he believed the packing from A. Louis contained asbestos because it looked like "braided asbestos packing." Pipefitters and mechanics used the packing material, and pipefitters and production personnel used the gaskets.

{¶ 33} Gozzard also recalled that in addition to J.M. pipe insulation, the workers also used Kaylo brand, but he could not recall who supplied it to Reactive Metals.

### Unverified Documents under Civ.R. 56

{¶ 34} In response to defendants' summary-judgment motions, Fisher's estate presented a letter from Jerome Bennett dated December 15, 2006. The letter is on RTI International Metals, Inc. ("RTI") letterhead, indicating that RTI was located in Niles, Ohio. Bennett's name and title, director of human resources, was listed at the top of the letter. The letter is addressed to one of the attorneys for Fisher's estate, and states that it is in response to the attorney's letter dated November 2, 2006, regarding documents she requested. The November 2, 2006 letter is not in the record on appeal. Bennett then states:

{¶ 35} "It was necessary to search our inventory of archived documents to attempt to find such documents. The documents that we were able to find indicate that Mr. Fisher resigned his employment with RMI Titanium Company (formerly Reactive Metals, Inc.) on June 14, 1963. * * * Additionally, I did discover a listing of vendors and material sold to RMI that may or may not have contained asbestos during that period."

{¶ 36} Attached to Bennett's letter was an internal letter of RMI dated March 14, 1983. The subject of the letter is "Past Procurement Record of Asbestos Material—Metals Reduction Plant." It then lists vendors and number of orders for each vendor. Relative to this appeal, the list indicates that RMI received several orders of asbestos products from Clark and many more orders from A. Louis.

{¶ 37} Clark and A. Louis argue that the vendor list cannot be used to oppose their summary-judgment motions because it is not appropriate evidence under Civ.R. 56(C), and it was not submitted with an affidavit. We agree.

{¶ 38} Civ.R. 56(C) provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence, and written stipulations of fact, if any, timely filed in the action, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. No evidence or stipulation may be considered except as stated in this rule." Id.

{¶ 39} If a document does not fall within the categories listed in the rule, the evidence can be submitted into evidence only by way of an affidavit. *Watts v. Watts* (Mar. 18, 1994), 6th Dist. No. CV 91–0302, 1994 WL 88765; *Martin v. Cent. Ohio Transit Auth.* (1990), 70 Ohio App.3d 83, 89, 590 N.E.2d 411. Civ.R. 56(E) provides how evidence submitted by affidavits that meet certain standards can be

considered. Civ.R. 56(E) provides that "[s]upporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated in the affidavit. Sworn or certified copies of all papers or parts of papers referred to in an affidavit shall be attached to or served with the affidavit. The court may permit affidavits to be supplemented or opposed by depositions or by further affidavits. When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the party's pleadings, but the party's response, by affidavit or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the party does not so respond, summary judgment, if appropriate, shall be entered against the party."

{¶ 40} Thus, Civ.R. 56 does not permit a party to submit unauthenticated copies of documents. *HSBC Mtge. Servs., Inc. v. McGuire,* 7th Dist. No. 07 CO 44, 2008-Ohio-6586, 2008 WL 5233547, ¶ 17; *Watts;* and *Leibold v. Columbus* (Nov. 15, 1977), 10th Dist. No. 77AP–142, 1977 WL 200571. The court in *Watts* explained, "The import of Civ.R. 56(E) is that all documents relied upon must be authenticated by and attached to an affidavit that meets the requirements of Civ.R. 56(E); the affiant must be a person through whom the exhibits could be admitted into evidence." Id.

{¶ 41} Fisher's estate contends that the Jerome Bennett letter is a written admission and thus qualifies as proper evidence under Civ.R. 56. But we disagree that it is a written admission. It indicates that Bennett is the human resource director of a company called RTI, not Reactive Metals. It does not explain the relationship between RTI and Reactive Metals. Even if we could assume that RTI and Reactive Metals are the same company, as Fisher's estate suggests, the accompanying vendor list is dated March 14, 1983, 16 years after Fisher left Reactive Metals. Thus, even if we found it to be proper evidence, it does not indicate that A. Louis's or Clark's asbestos products were at Reactive Metals during the time that Fisher was employed there. Accordingly, we disagree that it qualifies as a written admission.

{¶ 42} Fisher's estate also attached several invoices from Owens–Corning Fiberglass Corporation, purporting to show that Clark distributed asbestos products, specifically, Kaylo pipe insulation, to Reactive Metals in the early 1960s. Some of the invoices are dated after Fisher left Reactive Metals, but some are dated from 1960 to 1963, when Fisher still worked there. But these purported invoices are merely copies, not "sworn or certified," and not attached to an affidavit verifying that the documents are what they purport to be. Accordingly, they are not proper evidence under Civ.R. 56.

## Specific Evidence Relating to Clark

{¶ 43} Without the vendor list or the Owens–Corning invoices, there is no evidence that Clark's asbestos products were in the Reactive Metals facility during the time that Fisher worked there, since none of the deposition witnesses testified as to any Clark products. Thus, no question of material fact as to Fisher's exposure to Clark's products can remain if Fisher's estate did not even establish that Clark's products were in the Reactive Metals plant when Fisher worked there. We therefore find that the trial court properly granted summary judgment to Clark.

## Specific Evidence Relating to A. Louis

{¶ 44} Fisher's estate contends that "[t]he undisputed evidence in the record establishes that during Mr. Fisher's employment at Reactive Metals, [A. Louis] supplied asbestos-containing products to the facility." It further argues that it established, through Fisher's and Songer's testimony, that Fisher frequently worked around pipefitters and was exposed to dust created by their use of asbestos products, including those supplied by A. Louis. This evidence, coupled with "the uncontradicted evidence of [Fisher's estate's] experts," establishes that A. Louis's asbestos products were a substantial factor in causing his mesothelioma.

{¶ 45} Louis concedes that the record establishes that there was evidence, through Gozzard's testimony, placing "a relatively small amount" of its asbestos products in the Reactive Metals facility during Fisher's employment. But A. Louis claims that neither Gozzard's testimony, nor any other witnesses' testimony, established that Fisher was actually "exposed to any asbestos from any material supplied" by it or that it was a substantial factor in causing his mesothelioma.

{¶ 46} The evidence against A. Louis consisted of Fisher's, Songer's, and Gozzard's testimony. Viewed in a light most favorable to the nonmoving party, Fisher's estate, Gozzard's testimony established that A. Louis supplied two asbestos products during Fisher's employment at Reactive Metals: precut gaskets and braided packing material.

{¶ 47} This court has held, even before the adoption of the more stringent standard set forth in R.C. 2307.96(B), that merely placing a defendant's asbestos product in the workplace is not enough. *Vince*, 2007-Ohio-1155, 2007 WL 766114, at ¶ 13. A plaintiff must still establish that the product was a substantial factor in causing his injury. Id.

{¶ 48} To determine whether a plaintiff did establish that a particular defendant's product was a substantial factor, this court must consider the factors set forth in R.C. 2307.96(B)(1) through (4) (i.e., manner, proximity, frequency, and

mitigating factors). Our research indicates that since this statute went into effect, only six cases have cited it. And none of the six cases actually addressed these four requirements, because the plaintiffs in those cases filed their cases before the effective date of R.C. 2307.96(B), which the legislature explicitly made prospective only.

{¶ 49} Considering the R.C. 2307.96(B) factors, we find that Fisher's estate presented sufficient evidence, when viewed in a light most favorable to the nonmoving party, to create a question of fact regarding whether A. Louis's products were a substantial factor in causing Fisher's mesothelioma.

{¶ 50} Fisher worked at Reactive Metals for almost six years. Fisher, Songer, and Gozzard specifically testified that electricians worked alongside pipefitters as part of their regular job. Indeed, Fisher and Songer testified that they worked side by side with pipefitters when they were cutting and placing asbestos gaskets and packing material throughout the plant. Although the gaskets supplied by A. Louis were precut, Fisher testified that they were odd sizes and had to be cut to fit.

{¶ 51} In *Horton*, the Ohio Supreme Court described the concerns the *Lohrmann* court had. Because the General Assembly explicitly adopted the *Lohrmann* test, we find the Ohio Supreme Court's explanation of *Lohrmann* helpful despite the fact that in *Horton*, it was rejecting the *Lohrmann* test. The Supreme Court stated:

{¶ 52} "Indeed, the *Lohrmann* test is the product of the attempts of Maryland federal courts to deal with claims brought by employees of shipyards, workplaces so large that fiber drift might seem impossible. The *Lohrmann* court stressed the immensity of the shipyard in that case as a reason for affirming the district court's use of what later became known as the *Lohrmann* test:

{¶ 53} " '[W]hen one considers the size of a workplace such as Key Highway Shipyard, the mere proof that the plaintiff and a certain asbestos product are at the shipyard at the same time, without more, does not prove exposure to that product.' *Lohrmann*, 782 F.2d at 1162." *Horton*, 73 Ohio St.3d 679, 653 N.E.2d 1196.

{¶ 54} But here, we are not concerned with fiber drift. Fisher's estate presented sufficient evidence to create a question of fact whether he worked alongside pipefitters as a regular part of his job and as a result, was directly exposed to asbestos fibers.

{¶ 55} Accordingly, this court finds that the trial court erred when it granted summary judgment to A. Louis.

{¶ 56} Judgment affirmed with respect to Clark, but reversed with respect to A. Louis. This case is remanded for further proceedings consistent with this opinion.

Judgment affirmed in part
and reversed in part,
and cause remanded.

KILBANE, A.J., and ROCCO, J., concur.