[Cite as *Maddy v. Honeywell Internatl., Inc.*, 2020-Ohio-3969.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

BARBARA MADDY, EXECUTOR FOR   :
THE ESTATE OF JAMES MADDY,
DECEASED,                                          :

       Plaintiff-Appellant,                  :

                                               Nos. 108698 and 109066
       v.                                                    :

HONEYWELL INTERNATIONAL INC.,  :

       Defendant-Appellee.                 :

---

### JOURNAL ENTRY AND OPINION

**JUDGMENT:** REVERSED; REMANDED
**RELEASED AND JOURNALIZED:** August 6, 2020

---

Civil Appeal from the Cuyahoga County Court of Common Pleas
Case No. CV-17-881732

---

### *Appearances:*

Paul W. Flowers Co., L.P.A., Paul W. Flowers and Louis E. Grube, *for appellant*.

Willman & Silvaggio, L.L.P. and Steven G. Blackmer and McDermott Will & Emery L.L.P. and Michael W. Weaver, *for appellee*.

EILEEN A. GALLAGHER, J.:

{¶ 1} In this consolidated appeal, plaintiff-appellant Barbara Maddy, Executor for the Estate of James Maddy, deceased, ("appellant") appeals from (1) the trial court's decision granting summary judgment in favor of defendant-appellee

Honeywell International Inc. ("Honeywell") on appellant's asbestos-related tort claims and (2) the trial court's denial of her motion for relief from judgment pursuant to Civ.R. 60(B). Appellant contends that the trial court erred in entering summary judgment in favor of Honeywell because genuine issues of material fact exist as to whether decedent James Maddy's ("Maddy") exposure to Bendix brake products was a substantial factor in causing his terminal mesothelioma. Appellant also contends that the trial court abused its discretion in denying her motion for relief from judgment pursuant to Civ.R. 60(B)(1), (3) and (5) because it "mistakenly disregarded" material evidence, relied on misrepresentations and "inequitably viewed" the evidence in a light more favorable to Honeywell when granting Honeywell summary judgment. Finding that genuine issues of material exist as to whether Maddy was exposed to asbestos from Bendix brake products and, if so, whether that exposure was a substantial factor in causing Maddy's mesothelioma and death, we reverse the trial court's granting of summary judgment in favor of Honeywell and remand the case for further proceedings.

**Procedural and Factual Background**

{¶ 2} On June 13, 2017, appellant filed a wrongful death/survivorship action in the Cuyahoga County Court of Common Pleas against Honeywell (individually and as successor-in-interest to Allied Chemical, Bendix Corporation

("Bendix") and Allied Signal Corporation),[1] Parker Hannifin Corporation (individually and as successor in interest to EIS Automotive Corporation & Sinclair Collins)[2] and various John Doe defendants. Maddy asserted claims of negligence, product defect under Ohio's product liability statute, "willful and wanton conduct," loss of consortium and wrongful death against Honeywell, alleging that Maddy had contracted and died from mesothelioma as a result of his occupational exposure to asbestos-containing products that were manufactured, sold, distributed or installed by Honeywell in Ohio. Specifically, the complaint alleged that Maddy had been employed by Bekin's Moving and Storage in Georgia from the 1960s through 1977, by Wyandot Popcorn from approximately 1977-1980, by The Flxible Corporation from approximately 1980-1996 and by Motor Coach Industries from approximately 1996-2009. Maddy was diagnosed with malignant mesothelioma on April 17, 2014. He died on May 26, 2014 at age 70. Maddy's death certificate identified his cause of death as respiratory failure due to mesothelioma.

**Product Identification Evidence**

{¶ 3} In her discovery responses, appellant claimed that Maddy had been exposed to asbestos-containing Bendix brake products when working as a supervisor at Flxible Bus Corporation ("Flxible") in Loudonville, Ohio from 1980 through 1996. A former coworker, Thomas Burkhart, was the sole witness identified

---

[1] There is no dispute that Honeywell is the successor-in-interest to Bendix. For ease of discussion, Honeywell and its predecessors are herein referred to collectively as "Honeywell."

[2] Appellant voluntarily dismissed Parker Hannifin Corporation in June 2018.

to testify regarding Maddy's alleged exposure to these asbestos-containing products. As it relates to the claims in this case, Burkhart was deposed three times. Burkhart was first deposed on July 21, 2016 in *Maddy v. A.W. Chesterton Co.*, Ill. 3d Cir. Madison No. 14-L-1266, which Maddy's estate had filed against Honeywell and more than 90 other defendants in Madison County, Illinois and later dismissed (Burkhart's "first deposition"). Burkhart was deposed twice in this action — on May 24, 2018 (Burkhart's "second deposition") and March 13, 2019 (Burkhart's "third deposition").

{¶ 4} Flxible manufactured intercity buses that it sold to transit authorities nationwide. It went out of business in or around 1996. Flxible's buses used an air brake system that was originally designed by Bendix Westinghouse. According to Burkhart, in the 1980s, Rockwell axles with Bendix brakes were original equipment on Flxible's buses.

{¶ 5} Burkhart began working at Flxible's Loudonville, Ohio facility in October 1969 as a skirt paneler. He started working in the aftermarket parts and service department (also sometimes referred to as the "warehouse department") in approximately 1978. Maddy was hired in 1980. During the time they worked together at the Loudonville facility, Maddy was one of three supervisors in the aftermarket parts and service department and Burkhart was a group leader in the department. Burkhart "took [his] directions" from Maddy and the other supervisors.

**{¶ 6}** Burkhart worked with Maddy at the Loudonville facility from 1980 until 1995 or 1996 (when Burkhart was laid off) — excluding a period from 1981-August 1983 when Burkhart managed a warehouse at another Flxible facility in Ontario, Ohio. Even during the time he worked at the Ontario facility, however, Burkhart "still answered to [Maddy]" and, at times, attended meetings at the Loudonville facility.

**{¶ 7}** The aftermarket parts and service department comprised a quarter of the facility. The other three-quarters of the facility consisted of "a stamping plant, machine shop, paint shop, weld shop, [and] shearing." According to Burkhart, the aftermarket parts and service department "looked a lot like a Lowe's or a Home Depot warehouse" with racks clear to the ceiling and packing stations up front in the corner, i.e., six or seven tables at which parts were packed up and shipped out to other company warehouses or transit companies. The aftermarket parts and service department filled all of Plant 8 and over half of Plant 6 — two warehouses that were adjacent to one another — and together were approximately "four football fields" in size. Plant 8 was "maybe three-quarters of a football field, wide and long." Maddy's office was in Plant 8.

**{¶ 8}** Burkhart testified that Maddy usually worked from 6:00 a.m. to 8:00 p.m. and that, until 1985 or 1986, Burkhart usually worked third shift (from 12 a.m. to 7:00 a.m.) with opportunities "to work a couple additional hours at the end" if there was a need for overtime. Burkhart stated that Maddy's responsibilities included directing the workforce, meeting with vendors on issues, handling any

aftermarket parts and service issues and employee discipline. He stated that Maddy "[r]eported to a warehouse superintendent" and "answered to production and anything else that was to be done by the supervisor there." Burkhart described Maddy as a "workaholic" and a "hands-on supervisor who basically ran the whole operations" and spent "very little" time in his office. He stated that Maddy "operated on the second, third, first shift," was "the one who made sure things were running smoothly and everything was correct" and that he "dealt with" Maddy "as much on the third shift when [he] was a group leader * * * as [he] did when [he] was on first."

{¶ 9} Burkhart identified four different settings or situations in which Maddy was potentially exposed to Bendix brake products while working at Flxible: (1) the sale and shipment of replacement brake linings and preassembled brakes; (2) the riveting, drilling, chiseling and/or grinding of old brake lining material and the riveting of new brake linings as part of Flxible's warranty return/core exchange program; (3) the chiseling and grinding of old brake lining material and adhesion of new brake lining material as part of Flxible's bonded brake program and (4) adjustments made to new brake lining material on finished bonded brakes.

### The Sale and Shipment of Aftermarket Replacement Brake Linings and Preassembled Brakes

{¶ 10} Burkhart testified that Flxible maintained an inventory of aftermarket, replacement brake products stored in Plant 6 that it would sell to various transit authorities. Flxible's inventory included both "loose" brake linings

and preassembled brakes that consisted of a metal shoe to which a brake lining was already attached. Burkhart testified that, prior to 1990, all of the "loose" brake linings Flxible sold out of its Loudonville facility were manufactured and supplied by Bendix and that the preassembled brakes were supplied by Rockwell.

{¶ 11} The "loose" brake linings Flxible sold were predrilled and designed to fit a particular brake shoe. Flxible received the brake linings from Bendix in "generic" brown or white cardboard boxes, which would fit "anywhere from six to a dozen" brake linings. The boxes had a Bendix label stating "what the size was and so forth" and "a location it might have c[o]me from." The linings were generally shipped out to customers, as is, in the boxes in which they had arrived from Bendix. Only "very seldom[ly]" would Burkhart or others in his group have a need to "open up [the] boxes" and "look at them." Burkhart stated that it was his job to keep an inventory of the brake linings that came into the facility and that Bendix brake linings were present from "day 1" when he began working in the warehouse.

{¶ 12} Burkhart testified that the preassembled brakes supplied by Rockwell came one shoe per box. He testified that although, "at times," he or another employee would open up the boxes to "check and verify" that Rockwell had put the right brake shoe in the right box, generally, they did not remove the Rockwell preassembled brakes from their packaging.

{¶ 13} Burkhart testified that, in the 1980s, the preassembled brakes supplied by Rockwell included brake linings manufactured by Bendix: "The brake

shoes, * * * and they had the Bendix on those at that time, would always come from Rockwell." Burkhart further explained, in his second deposition:

Q.     Do you specifically remember seeing brakes at the facility, at the Flxible facility, where there was Bendix on that lining area?

A.     Absolutely, because we sold them to [sic] Bendix. Our shipment of shoes was always Bendix.

Q.     What do you mean by that?

A.     Well, that was our supplier for brake shoes.

       * * *

Q.     * * * You said that Bendix sold brakes to Flxible?

A.     Uh-huh.

Q.     Did those brakes come already together as one whole piece?

A.     They could at times. They could — it was a lot on what the transit company wanted. * * * We would get skids of just the brake shoes. And then we would get skids of brake shoes already put together. Now, those came — they had the Bendix logo on them, but they were in Rockwell boxes because Rockwell had the — was the axle system that we did, but they were using Bendix brakes. So that's how they would come. If we shipped them out the shoe ready just to take out and put on, then it was — they were all — they would be Rockwell. If it was just brake pads, they were Bendix.

       * * *

       Now, the pad and brake shoe was [sic] what was original equipment, but it was part of the Rockwell axle that we purchased. So when we did the aftermarket, if the companies didn't want to purchase the whole steel and the pads, they would just order the pads. When we did the pads, we did them — they came in directly from Bendix. If they wanted the shoe and the pad, then they came in from Rockwell.

Q.     When you say "the pads," is that the lining part of it?

A.     The lining.

Q.     So the brake shoe is the metal part, and what you're calling the
       pad is the lining that went on the shoe?

A.     Right[.]

       * * *

       When you're buying them from Rockwell as part of their system,
       they had Bendix brakes, but they had * * * bolted them and did
       that work at Rockwell in Marysville.

{¶ 14} Burkhart testified that, in later years, he "just took" that the linings used on the preassembled brakes supplied by Rockwell "were always Bendix" but that he was "not certain" of that fact.  He testified, however, that "up to probably 1990," "the only brake shoes" he had seen at the Loudonville facility were "Bendix brake shoes."

{¶ 15} Burkhart testified that in 1973, Flxible began taking steps to remove asbestos from the workplace.  However, he could not state what those steps entailed other than that Flxible had discontinued the use of some asbestos insulation on its mufflers.  Burkhart testified that he had no personal knowledge as to whether any of the loose Bendix brake linings or any of the brake linings used in the Rockwell preassembled brakes contained asbestos but indicated that there was nothing on the boxes indicating that the products were asbestos-free.

**Flxible's Warranty Return/Core Exchange Program**

{¶ 16} During the time Maddy worked for Flxible, the Loudonville facility also received shipments of used brakes from transit companies that were covered by warranty or were "returned" as part of a "core exchange" program Flxible operated

in conjunction with its warranty. According to Burkhart, transit companies would send in used brakes with worn brake linings, i.e., "brake cores," to the facility. If there was a "warranty issue," that would be addressed under the terms of the warranty, and a new brake core would be sent out to the transit authority. Transit authorities that participated in the warranty return/core exchange program could also return used brake cores from Flxible buses in exchange for credits toward future purchases. As Burkhart explained:

> Q.   * * * So if you could in your own words, sort of explain what was this brake warranty program that existed in Loudonville?
>
> A.   Well, it was just — we warranted the brakes for the transit companies.
>
> Q.   Okay. So kind of, if you could walk us through how that worked?
>
> A.   Well, you know, if they wanted to return their cores to us, and we would ship them back out new ones, that was within their warranties, you know, that they had, and that, you know, if it was a Flxible bus.

{¶ 17} Burkhart testified that the warranty return/core exchange program had been in existence since before he started with the company in 1969. Burkhart stated that the program was particularly appealing to smaller transit authorities like Jamaica or Syracuse, New York that "didn't want to waste their time" getting brakes relined and "just wanted to buy the whole brake shoe and then send it back and get some credit on it."[3]

---

[3] No documents were submitted on summary judgment setting forth the terms of the warranty return/core exchange program as it existed prior to 1989. The undated marketing materials for Flxible Shur-Bond brand bonded brakes, which Honeywell

**{¶ 18}** Burkhart testified that once received, the used brake cores were counted and logged in at tables in Plant 8, approximately "150 feet or so" from Maddy's office. After they "figur[ed] out * * * what [Flxible] was doing with the warranty," i.e., "giving them a core [or] credit for their core[s]," and the necessary paperwork was completed, the used brakes were placed in a holding bin or crate on a rack in Plant 8 until a work order was received, which could be two to four weeks later.

**{¶ 19}** Once a work order was received, the used brakes were transferred to Department 52, which was located in a different building from Plants 6 and 8, for relining. Flxible employees would unscrew the nuts and bolts or drill the rivets off the used brakes — "whatever way it was stuck on" — to remove the old linings and

---

included in the supplement to its summary judgment motion, contains a description of Flxible's "used shoe return program," as it then existed, as follows:

> Customer's [sic] desiring to participate in Flxible's "Return Shoe Program" may do so by contacting your local Flxible Parts Distribution Center. Upon request, Flxible will furnish you, at no charge, a returnable container, into which you place your used shoe assemblies. When the container is full, ship the used shoes, freight collect, to the address provided on the preprinted bill of lading attached to each returnable container. Upon receipt by the Flxible Corporation, the used shoes will be sorted by part number, counted and inspected. All counts and inspections by Flxible are final. Flxible will issue credit for each shoe received that meets inspection criteria, i.e., that the shoe returned is an O.E.M. Rockwell shoe and is usable for a future bonding application. Credit memos will be issued to the customer and applied to the customer's Flxible parts account.

> (Emphasis deleted.)

Although the document appears to be undated, given that it relates to Flxible bonded brakes and Flxible did not initiate its bonded brake program until 1989, *see* discussion below, the document would have had to have been from 1989 or later.

replace the old linings with new linings, which were then riveted onto the old brake shoes. There were two brake linings per shoe and 12 rivets per lining. According to Burkhart, removing the nuts and bolts or rivets created debris from the brake lining material being removed. If the old brake lining did not detach from the brake shoe once the bolts or rivets were removed, the old lining would be ground or chiseled away using a grinder or air chisel. Burkhart testified that this process could create visible dust. Burkhart could not estimate what percentage of brake linings removed under the warranty return/core exchange program were required to be chiseled or ground in order to remove the worn brake lining.

{¶ 20} Burkhart testified that new Bendix brake linings from the company's stock were used to reline the brakes and were riveted onto the used brake shoes. As Burkhart described it, Bendix was "sort-of the in-house brand Flxible used on all of their shoes that they were relining to send out." Once the brakes were relined, they were placed in inventory in Plant 6 to be resold.

{¶ 21} Burkhart testified that used brakes were received "at a steady pace" at the Loudonville facility. He estimated that, on average, 400 or 500 brake cores were returned each year to the facility under the warranty return/core exchange program but that he did not know for certain because it was not his job to "keep count." Burkhart stated that he personally worked in the warranty department, which handled the warranty return/core exchange program, at most "a couple of weeks a year" when filling in for a vacationing coworker. Burkhart specifically recalled only one instance where he personally handled brake cores under the warranty

return/core exchange program. He testified that sometime in the early 1980s, he handled a "warranty issue" for the Chicago Transit Authority involving "50 or so" worn brake cores, for which the transit authority requested and received "core return credits." Burkhart testified that the relining of those 50 used brakes was "kick[ed] out in a day" or perhaps even "half a day."

{¶ 22} Burkhart testified that although Maddy supervised the warranty department, he did not supervise the work performed in Department 52 and did not personally handle any of the brakes returned through the warranty return/core exchange program. However, he testified that Maddy went "right by" the area in which that work was performed as he walked through Department 52 two or three times a day on his way to meet with his supervisor, whose office was located upstairs in the same building, and that he would occasionally stop to "chit chat" with the workers or their supervisor as he passed by. The employees in Department 52 were not working with brake shoes every day. "They would be grinding panels or doing special build ups of different little thing on older buses * * * [or] [t]hey might be riveting or doing all kinds of stuff," but working with the brake shoes was one of the tasks those employees regularly performed.

**Bonded Brake Program**

{¶ 23} To assist Flxible in starting a bonded brake business, Flxible's parent corporation, General Automotive Corporation, acquired a brake company located in Jackson, Michigan. At that time, brake pads were generally bolted or riveted to the

brake shoes. Flxible sought to use a special adhesive it had developed to bond the brake pads directly to the brake shoes without bolts or rivets.

{¶ 24} The acquisition included a stock of used brake shoes with worn, bolted brake linings that needed to be replaced, which were sent to Loudonville from the Michigan facility "on broken skids, pallets, whatever way they could ship them." Burkhart indicated that "some were used, some were not very much used," "[t]hey were just a bunch of brake shoes." These brakes were originally stored in large baskets in a fenced-in area on a hill outside Plants 6 and 8. Burkhart indicated that it was "the ideal place" for the brake shoes to be stored because they had "stacks and stacks and stacks" of them. Other than the fact that they came from the Michigan facility, Burkhart had "no idea" regarding the origin of any of the used brakes or when they had been manufactured. Burkhart explained: "[Y]ou don't know where the shoes came from and how long they had been at the Michigan place or where they came from. And they could have been on vehicles from ten years earlier."

{¶ 25} In his first deposition in 2016, Burkhart testified that the bonded brake program started in 1985 or 1986. In his second deposition in 2018, Burkhart testified that "it had to be after '83," after he had returned to the Loudonville facility. In his third deposition in 2019, after apparently reviewing some additional documents received from appellant's counsel regarding the acquisition date of the Michigan company, Burkhart testified that his prior deposition testimony was incorrect and that it was actually "[s]omewhere around February, March of [19]89" that the Loudonville facility began receiving used brakes from the acquired

Michigan company and initiated the bonded brake program at the Loudonville facility.[4]

**{¶ 26}** Burkhart testified that the company's plan was to run the bonded brake program out of another of Flxible's facilities in Georgia but that "to get it going," after the company received a large order for bonded brakes from the New Jersey Transit Authority, the company started the program in Loudonville. Once the bonded brake program came to Loudonville, the company "basically * * * gave it" to Maddy.

**{¶ 27}** The bonded brake program consisted of employees removing the used bolted-on linings from the brake shoe, cleaning the brake shoe and placing adhesive on the shoe to bind a new brake lining to the shoe. The employees used air chisels to break off the old brake lining and used a grinder to grind off the remains of the old lining "once it was all busted up" until the shoe was smooth. The process of removing the old brake linings from the brake shoes was "dusty" and "dirty." Burkhart testified that no dust collection or ventilation system was in place in the area.

---

[4] In is unclear from the record precisely what "additional documents" were obtained by counsel and shown to Burkhart that led to this change in testimony or when those documents were obtained. In its appellate brief, Honeywell asserts that appellant's counsel sent letters to appellant's causation and industrial hygienist experts, dated February 21, 2019, indicating that "additional information" had been "revealed" including, among other things, a correction to Burkhart's deposition testimony, specifically, "that the bonded brake program did not start in 1983, but it began in October, 1988." However, these letters do not appear to have been part of the stipulated summary judgment record.

{¶ 28} The removal of the used brake linings occurred in an area in Plant 8, which had been cordoned off with overlapping pieces of plastic sheeting hung inside the racks or shelving units in an effort to contain the dust. Two or three work stations were set up inside the work area.[5] The plastic sheeting extended up towards the ceiling but the plastic sheeting was not sealed; the area was not otherwise closed off or sealed off from the rest of the plant.

{¶ 29} Maddy supervised the removal of the old brake linings in Plant 8. According to Burkhart, because he was a supervisor, Maddy was barred by union contract from personally performing any of the work, including removing the old linings from the brake shoes or relining the brake shoes, but that he did go into the area where others were doing that work "continuously," overseeing and directing the work force, as well as "handling [his] normal responsibilities."

{¶ 30} Burkhart testified that, while the program was in operation at the Loudonville facility, two shifts worked on the bonded brake project, i.e., approximately eight employees on the first shift and five or six employees on the second shift. Burkhart stated that, when he was working third shift, he "would have to come in at times" and Maddy would "take [him] back" into the area of Plant 8 where the bonded brake work was being done so that Maddy could "show [him]

---

[5] The size of this work area is unclear from the record. In his second deposition, Burkhart described the work area as between eight and ten feet wide and 50 to 60 yards long. In his third deposition, he described the area as "maybe 25 yards" wide by "maybe three-quarters or half of a football field" long.

what needed to be done for the day or for the evening" because the third shift was the "cleanup crew."

{¶ 31} In his first deposition, Burkhart testified that they "usually got out two skids * * * probably 150 to 200" brake shoes a week. In his second deposition, Burkhart testified that, initially, it took a whole week "to do the first skid." "By the time they were finishing up," the facility was "putting out two, three, four skids a day," consisting of "anywhere from 50 to a hundred" brake shoes per skid. Burkhart estimated that, in total, the company relined "a couple thousand" old brake shoes as part of the bonded brake program.

{¶ 32} Burkhart described the removal of the old brake linings from the brake shoes received from the Michigan facility as "the * * * dirtiest, dustiest job I ever seen," generating a "quarter inch" of dust. Burkhart testified that the workers who performed this work wore "white trench coats" or a coverall or pull-over paper suit and a paper mask and usually had shields. They did not wear respirators. In his first deposition, Burkhart testified that Maddy "[v]ery seldom" wore a face mask. In his second deposition, he stated that Maddy "might have" worn a coat and mask "when they were starting up or when they were doing it" but that Maddy did not wear a coat and mask when he was just going "in and out" of the work area "all the time" because "it would have just took too much time." Burkhart stated Maddy "couldn't help" but inhale some of dust when he went into the area where they grinding the old brake linings; "[i]t was just a part of * * * walking into that area."

Burkhart acknowledged, however, that he was not usually in the work area with Maddy and that he would not have known what Maddy did when he was not present.

{¶ 33} The old brake lining material that was chiseled or ground off the used brakes was disposed of in 50-gallon drums lined with plastic. Burkhart indicated that the workers who "cleaned up" the used brakes swept up the dust at the end of the day and placed it into the lined 50-gallon drums. He stated that the crew he led gathered up the "cleaned up" brakes and placed them on skids to be sent over to production.

{¶ 34} Burkhart testified that there were different manufacturers of used brakes that were "cleaned up" and relined using this process but that he knew the used brakes included some Bendix brakes because he recognized the Bendix insignia on some of the old brakes Flxible had received from the Jackson facility. In his first deposition, Burkhart testified:

Q.    Do you know who manufactured these brakes?

A.    Well, it was different groups. But because I was a truck driver's son and had used Bendix brakes, I understood the insignia of Bendix and they're — there was Bendix brakes in that group.

        * * *

Q.    And you recall seeing the Bendix logo or insignia on these brakes where this [i.e., using an air chisel and a grinder to remove old braking linings] was happening?

A.    On some of them.

Q.    Right. Not all of them —

A.    Yeah.

Q.   — but some of them?

A.   Yeah.

{¶ 35} In his second deposition, Burkhart testified:

Q.   One of the brands that you identified last time was Bendix. I believe you indicated that you saw a Bendix insignia on one or some of the brakes?

A.   Yeah.  And Bendix is big in that area, so we were selling Bendix brakes ourselves.

Q.   Do you recall any other specific brands besides Bendix?

A.   No, not really because I really wasn't working that much with them.

Q.   And how was it that you knew there were Bendix brakes included in all of these brakes?

A.   Because Bendix got their own stamp on their brakes.

Q.   What did that stamp look like?

A.   It's a square with Bendix on it or B something.  It's been a while since I seen those.

Q.   And where was that located? Where was that stamp?

A.   Right on the shoe.

     * * *

Q.   Now, on this brake, where was that Bendix insignia at?

A.   Well, usually, you had one right in this area, and you also had one right on the brake shoes themselves.  (Indicating.)

Q.   On the lining area?

A.   Yep.

{¶ 36} He explained that it was "usually * * * hard to see what was on the brake shoe itself" because the brakes were used and "some of them would be worn down beyond noticeable" but that he specifically recalled seeing "some" linings "that were not well used that had Bendix logos still." With respect to the frequency with which Burkhart saw used brake shoes or linings with the Bendix logo in the baskets of brakes shoes received from the Michigan facility, Burkhart testified in his second deposition:

> Q. Can you tell me how many you saw the Bendix logo on?
>
> A. I'm probably looking at five or six because I really didn't look at — I wasn't on top of the getting them out and dusting them down. I would just now and then be in there to take a look and you would see them. To say they were all there, I couldn't tell you that because I didn't have that kind of an access to do that.
>
> * * *
>
> Q. And you said you would have seen maybe a handful of them because —
>
> A. Yeah. I didn't go through every basket looking and seeing what all the brands were.

{¶ 37} Burkhart testified in his third deposition: "The baskets, when they came down, a few of them had the Bendix logos."

{¶ 38} With respect to whether any of the brakes received from the Michigan company contained asbestos, Burkhart testified in his first deposition that "[t]hose brake shoes, as I know it, from what I've seen in the past, probably had asbestos in them." No further inquiry was made at that time regarding the basis for Burkhart's belief that these brakes "probably had asbestos in them."

{¶ 39} In later depositions, Burkhart testified that "at one time, they were asbestos[, b]ut we were told at th[at] point that they weren't asbestos." Upon further inquiry, Burkhart explained that when he raised the issue with Maddy, Maddy told Burkhart that Maddy had been told in a meeting that the brakes received from the Michigan facility did not contain asbestos. Burkhart indicated that there was no way to tell from looking at the brake shoes or linings whether they contained asbestos or whether the brakes linings were original to the brakes. Burkhart could not state the average useful life of brake linings in this application.

{¶ 40} Once the old linings were removed and the brake shoes cleaned up, the brake shoes were taken to Department 52, where new Bendix brake linings from the company's stock were bonded to them. Burkhart had no personal knowledge as to whether the new Bendix brake linings that were bonded to the old brake shoes contained asbestos but stated that Maddy had told him the new Bendix brake linings that were being bonded onto old brake shoes at that time were "non-asbestos."

{¶ 41} The new brake linings came precut to fit the used brake shoes. At times, the newly bonded linings would shift after they were bonded to the old brake shoe. The workers would grind off a small part of the lining using a small hand grinder so it would fit into the brake drum. Once the brakes were taken to the production area for the bonding of the new lining and any grinding that needed to be done, Maddy was no longer the supervisor of this process. Once the new linings were bonded to the brake shoes, they were sent back to the aftermarket parts and service department where they would be boxed up and shipped out.

{¶ 42} The bonded brake program operated at the Loudonville facility for approximately three to six months. Once the New Jersey order was completed and "there wasn't real heavy demand" for relined bonded brakes, the bonded brake program was transferred to another Flxible facility in Georgia.

**Adjustments Made to Bonded Brakes**

{¶ 43} Burkhart testified that even after the bonded brake program was transferred to the Georgia facility, for the next one to three years, some brake shoes with poorly bonded linings were sent to Loudonville to correct fit issues. Employees would use small hand grinders to grind down the brake linings until the brake would fit into a template, i.e., "[w]e just took them out of the box and grounded them to a jig that was made by the engineering department that would allow these brakes to fit into the brake drums. And they were shipped back out." With respect to whether Bendix brake linings were used on those brakes, i.e., after the bonded brake program was transferred to Georgia, Burkhart testified: "Well, we had used Bendix brakes off and on, you know. I don't remember the exact brake on Bendix there at that point as I did when we brought the originals in."

{¶ 44} When the volume of bonded brakes sent to Loudonville for correction was high, the brakes were sent to the production area to be fixed. Maddy did not supervise this production work. When workmanship improved and the volume of brakes sent to Loudonville for correction decreased, i.e., when "12 or 13" or "20 or 30" brakes were sent to Loudonville for correction, those corrections were made in Plant 8. Burkhart testified that plastic sheeting was not utilized at that time because

"there wasn't that much grinding being done." He stated that the grinding dust "wasn't of the same heaviness" as when grinding off the old bolted brake linings but that "there was dust being flew up and you'd breathe it just by walking up to it."

{¶ 45} Burkhart estimated that in total, fine grinding work (including both the fine grinding work performed to get the relined bonded brakes within tolerance before the bonded brake program was transferred to the Georgia facility and the fine grinding work that was performed to correct continuing fit issues after the program was transferred) was performed on 1,000-2,000 brakes at the Loudonville facility.

**Use of Asbestos in Bendix Brake Products**

{¶ 46} Honeywell manufactured and sold asbestos-containing Bendix brake blocks from 1948 until 1988 and asbestos-containing Bendix brand brake linings from 1939 until 2001.[6] In its discovery responses, Honeywell stated that it introduced non-asbestos brake blocks in 1966 for "super heavy duty drum brakes (e.g. logging and mining trucks)" and that, in 1983, Honeywell introduced asbestos-free Bendix brake blocks for heavy duty vehicles using air brake systems. Eugene Rogers, a former Bendix employee and former Honeywell corporate representative, testified that Honeywell first introduced a non-asbestos brake block "in the late 1960s, '68, '69, sometime in that era," but that it was limited to a specific application,

---

[6] Rogers and Cohen testified that the difference between a brake block and a brake lining is its application, function and physical size, i.e., that brake blocks are "[t]he same type of material" as brake linings but "thicker and wider." However, given that the parties did not generally distinguish between brake blocks and brake linings when questioning witnesses, particularly Burkhart, we do not attempt to do so here.

i.e., "use on logging trucks in the west coast mountains."  He testified that in approximately March 1984, Honeywell introduced a non-asbestos brake block under the trade name Ultravar designed for "air brake trucks and buses, any heavy vehicle with an air brake system."

{¶ 47} Joel Cohen, Honeywell's designated corporate representative for Bendix and the Friction Materials Division, testified that until 1983, all Bendix brake linings manufactured for use on passenger vehicles contained asbestos.  He stated that from 1983-2001, Bendix manufactured and sold both asbestos-containing and asbestos-free brake linings.

{¶ 48} With respect to the asbestos content of its asbestos-containing brake products, Honeywell stated, in its discovery responses:

> Honeywell states that over the years, motor vehicle manufacturers have made changes in vehicle design (weight, chassis length, engine performance, etc.) and in brake performance criteria (noise, durability and stopping distance limits) which required modifications in product formulations to meet the charged criteria.  As a result, the percentage of processed chrysotile asbestos fiber in asbestos-containing brake linings and disc brake pads varies depending upon the composition of a particular item but, on average, is approximately 50% (by weight).  The percentage of processed chrysotile asbestos fiber in asbestos-containing brake blocks varied depending upon the composition of a particular item but, on average, was approximately 35% (by weight).  Brake linings and disc brake pads also contain a resin binder system and various friction modifiers and fillers which encapsulate the processed chrysotile asbestos fibers.
>
> Asbestos-containing brake blocks (manufactured between 1948 and 1988) also contained a resin binder system and various friction modifiers and fillers which encapsulated the processed chrysotile asbestos fillers.
>
> * * *

Honeywell and its predecessors began phasing out asbestos-containing friction products beginning in the mid-1980s and Honeywell last manufactured such products in June 2001.

{¶ 49} In an undated "application for temporary variance and for interim order" with respect to certain effective dates required by the asbestos standard, 29 C.F.R. 1910.1001 (the "application for temporary variance"), Honeywell stated that "[i]n the after-market for brake blocks (for air-braked vehicles), asbestos-free blocks account for 35% of sales this year, up from 5% in 1983." Accordingly, in 1983, 95 percent of brake blocks sold by Bendix for air-braked vehicles contained asbestos.[7]

{¶ 50} No sales records were produced by either party. Cohen testified that he was advised that a search had been conducted of Honeywell's existing records but that no records of any sales by Honeywell to Flxible were located.

**Honeywell's Motion for Summary Judgment**

{¶ 51} In June 2018, Honeywell filed a motion for summary judgment, arguing that appellant (1) had no "competent evidence" that Maddy had been exposed to any asbestos-containing Bendix products and (2) could not establish, based on the factors specified in R.C. 2307.96, that Maddy's exposure to any asbestos-containing Bendix product was a substantial factor in causing his injuries. Honeywell's motion was based on Burkhart's testimony; Honeywell did not argue that appellant lacked sufficient expert evidence to support her claims. In support of

---

[7] It is unclear what year "this year" is, as referenced in the document. The copy of the document in the record is undated and incomplete. It does not include referenced attachments and exhibits. The compliance dates for which an extension is sought begin in October 1986.

its motion, Honeywell attached a copy of the transcript from Burkhart's second deposition.

{¶ 52} Appellant opposed the motion. She argued that summary judgment was not warranted because (1) Burkhart's testimony regarding Maddy's exposure to Bendix brake products combined with evidence of the use of asbestos in Bendix brake products were sufficient to establish that Maddy had been exposed to asbestos-containing Bendix brake products and (2) Burkhart's testimony regarding the manner, frequency, proximity and duration of Maddy's exposure combined with the opinions of her expert, Dr. Arthur Frank, were sufficient to establish that Maddy's exposure to asbestos-containing Bendix products was a substantial factor in causing his mesothelioma and death. In support of her opposition, appellant submitted copies of the transcripts from Burkhart's first deposition and Cohen's February 28, 2018 deposition in *Bailey v. Auto Zone, Inc.*, Tenn.Cir.Ct. Lawrence Cty. No. 2752-13 ("Cohen's 2018 deposition"). Appellant also submitted (1) a 2018 affidavit and expert report from Dr. Frank in which he opined that Maddy's "exposure to asbestos-containing dust from Bendix brakes, and the dust that was created by the grinding machines, caused him to develop a mesothelioma which caused his death" and (2) a 2016 affidavit from Dr. Frank in which he set forth his "fuller views on the relationship of exposure to asbestos and the subsequent development of disease."

{¶ 53} In December 2018, Honeywell filed a "supplement" to its motion for summary judgment (the "supplement"), requesting that the court consider

additional documents when ruling on its motion, specifically: (1) a copy of a "distributor net price sheet" for "heavy duty and light truck blocks and lining" for Bendix Friction Materials Division (effective September 1, 1971) (the "1971 distributor net price sheet"); (2) a copy of a "Bendix memo," dated November 16, 1983, regarding the "Ultravar Asbestos-Free Program" (the "1983 Ultravar memo"); (3) copies of advertisements or marketing materials for Ultravar, described as "[t]he asbestos-free brake block from Bendix" (dated "12/84" and "10/86") ("Ultravar marketing materials"); (4) a copy of excerpts from a Grumman Flxible Corporation transit coach 870 maintenance manual (undated) and (5) a copy of marketing materials for Flxible Shur-Bond ("Flxible Shur-Bond marketing materials") (undated). The documents were not accompanied by an affidavit or any explanation or argument as to why they were relevant to, or should otherwise be considered in support of, Honeywell's motion for summary judgment.

{¶ 54} Appellant filed an objection to Honeywell's supplement, arguing that it should not be considered because it was untimely filed — having been filed six months after the filing of Honeywell's motion for summary judgment — and consisted of "unauthenticated" and "inadmissible" evidence.

{¶ 55} In response, Honeywell submitted an affidavit from attorney Jennifer Contegiacomo, Honeywell's "records custodian." Identifying the documents by bates number, Attorney Contegiacomo averred that the 1971 distributor net price sheet and the 1983 Ultravar memo attached to Honeywell's supplement to its motion for summary judgment were "true copies of the original records found in

Honeywell's available business records" and "were made and kept in the regularly conducted business activity and regular practice and custom of Honeywell."[8]

{¶ 56} In February 2019, appellant filed a supplemental opposition to Honeywell's motion for summary judgment, reiterating the arguments in her initial opposition and pointing to additional evidence in the record of Maddy's exposure to asbestos-containing Bendix products at Flxible. In support of her supplemental opposition, appellant submitted copies of excerpts from Burkhart's second deposition, Honeywell's responses to plaintiff's master set of interrogatories (dated 2005) and the application for temporary variance.

{¶ 57} On February 21, 2019, the trial court denied Honeywell's motion for summary judgment. The trial court stated that, based on Burkhart's testimony, there was evidence that Maddy was "sufficiently close" to the grinding of Bendix brake shoes in 1983 and 1986 "to permit the experts to opine that the friable asbestos fibers thus released were the cause of his mesothelioma" and that appellant had, therefore, "raised questions of fact sufficient to withstand summary judgment." The court explained:

> According to plaintiff[']s product identification witness Thomas Burkhart, Mr. Maddy was a hands on supervisor who spent much of his time on the floor where work with Bendix products occurred. For several months in 1983, some Bendix brake linings were removed from brake shoes with chisels and grinders, thus releasing some of the

---

[8] The affidavit also referenced a third document, identified by bates number HWBX00055189; however, that document was not among the documents submitted in the supplement. The affidavit did not address the Ultravar marketing materials, the maintenance manual or the Flxible Shur-Bond marketing materials contained in the supplement.

encapsulated fibers. At that time, 95% of the Bendix products contained chrysotile asbestos.

In 1986, (p. 103) Bendix brake shoes had to be ground (p. 87) and some linings had to be ground (p. 93); at this time, 65% of Bendix products were asbestos containing. Therefore, it is more probable than not that these products contained asbestos. While Mr. Maddy did not perform this work personally, he was sufficiently close to permit the experts to opine that the friable asbestos fibers thus released were the cause of his mesothelioma. Consequently, plaintiff has raised questions of fact sufficient to withstand summary judgment.

{¶ 58} At or around the time the trial court denied Honeywell's motion for judgment, additional information was acquired or disclosed that led Burkhart to conclude that Flxible's bonded brake program actually started in 1989, rather than in or around the mid-1980s as he had originally testified. The trial court permitted Honeywell to reopen Burkhart's deposition to address the issue. This led to Burkhart's third deposition in March 2019.

**Honeywell's Motion for Reconsideration**

{¶ 59} On April 4, 2019, Honeywell filed a motion for reconsideration of the order denying its motion for summary judgment ("motion for reconsideration"). Based on (1) Burkhart's testimony in his third deposition that Flxible's bonded brake program started in 1989 (rather than 1983 and 1986 as stated in the trial court's decision on summary judgment) and (2) its own evidence that Bendix "no longer manufactured any asbestos-containing brake blocks by 1988," Honeywell argued that "the basis" for the trial court's original denial of summary judgment was "eliminated" and that appellant could no longer establish that Maddy was exposed to any asbestos-containing Bendix brake products at Flxible, much less that Maddy's

exposure to asbestos-containing Bendix products was a substantial factor in causing his mesothelioma. Honeywell's motion for reconsideration was based on fact witness testimony regarding Maddy's alleged exposure to Bendix brake products and other product identification evidence; Honeywell did not argue that it was entitled to summary judgment because appellant lacked sufficient expert evidence to support her claims.[9]

{¶ 60} Appellant opposed the motion for reconsideration. She argued that the asbestos content of Bendix brake products was established through Honeywell's discovery responses and the testimony of its corporate representatives, that Burkhart's testimony relating to the warranty return/core exchange program "establishe[d] the proximity, frequency, and duration of Mr. Maddy's exposure to Honeywell's asbestos" and that, given that evidence and the opinion of Dr. Frank, it was "now a question for the jury to determine" whether Maddy's exposure to asbestos-containing Bendix brake products was a substantial factor in causing his mesothelioma.[10]

---

[9] In support of its motion for reconsideration, Honeywell submitted copies of: (1) the transcript from Burkhart's third deposition; (2) excerpts from a "Flxible parts catalog"; (3) excerpts from Cohen's February 2018 deposition; (4) the 1971 distributor net price sheet; (5) the Ultravar marketing materials and Honeywell's responses to plaintiff's case-specific interrogatories (dated 2018). Honeywell also incorporated its original summary judgment motion and its December 2018 supplement.

[10] In support of her opposition, appellant submitted copies of: (1) Flxible Transit Coach General Specifications, model FD47-311-1, dated December 1963; (2) marketing materials from the Bendix Heavy Vehicle Systems Group entitled, "The Development of Bendix Air Brake Systems," dated June 1979; (3) excerpts from Roger's February 21, 1992 trial testimony in *Goret v. Abex Corp.*, Cal. Super. Ct. San Francisco Cty. No. 935276 and

**{¶ 61}** Honeywell filed a reply in which it asserted that appellant had misrepresented Burkhart's testimony, had made various "assumptions" that were not supported by the evidence regarding the brakes and brake linings that could be used on Flxible's buses and had failed to raise any genuine issue of material fact or "meet the burdens set forth in R.C. 2307.96."[11]

the transcript of his September 11, 1985 deposition in *Cody v. Bendix Corp.*, N.D.Tex. No. CA3-84-1208-F; (4) excerpts from Honeywell's responses to plaintiff's master set of interrogatories (dated 2005); (5) the transcript from Burkhart's third deposition; (6) a newspaper article, *Flxible Makes Acquisition*, News Journal (Oct. 2, 1988); (7) Dr. Frank's 2018 expert report and 2016 affidavit and (8) the transcript from Cohen's February 2018 deposition. Appellant also submitted a supplemental affidavit and expert report from Dr. Frank, dated April 2019, in which he stated that, after reviewing the transcript from Burkhart's "new deposition," it "continues to be my opinion that Mr. Maddy was exposed to asbestos-containing dust from Bendix brakes which contributed to his developing a malignant pleural mesothelioma that caused his death."

[11] In its reply in support of its motion for reconsideration, Honeywell also stated that it had filed a motion in limine to exclude the testimony of two of appellant's experts, Dr. Arthur Frank and Dr. Theresa Emory, "pursuant to the Daubert standard," and asserted that appellant's experts' reports were "entirely insufficient to establish whether Mr. Maddy's alleged exposure to Bendix asbestos-containing brakes were a 'substantial contributing factor' in causing his disease." It does not appear from the stipulated record that the trial court ruled on Honeywell's motion in limine. To the extent such evidence may be necessary to support her claims, we do not address whether appellant has sufficient, admissible expert evidence to support her claims in this appeal. Honeywell did not move for summary judgment or for reconsideration on the basis that appellant lacked sufficient, admissible expert evidence to support her claims and the trial court did not consider the issue in ruling on Honeywell's motion for reconsideration. *See, e.g., Rahmes v. Adience, Inc.*, 8th Dist. Cuyahoga No. 88427, 2007-Ohio-4298, ¶ 4 ("The moving party bears the initial responsibility of informing the trial court of the basis for the motion, and identifying those portions of the record which demonstrate the absence of a genuine issue of fact or material element of the nonmoving party's claim."), quoting *Potts v. 3M Co.*, 8th Dist. Cuyahoga No. 87977, 2007-Ohio-1144, ¶ 12. (Internal citations omitted.)

As additional support for its motion for reconsideration, Honeywell submitted: (1) a diagram of the Bendix Heavy Vehicle Systems Division's dual circuit air brake system; (2) the transcript from Cohen's February 2019 deposition in this case and (3) marketing material for Flxible's Metro bus (undated), indicating that it used Rockwell brakes with "non-asbestos linings."

{¶ 62} On May 21, 2019, the trial court granted Honeywell's motion for reconsideration and entered summary judgment in favor of Honeywell. The court stated that its earlier decision denying Honeywell's motion for summary judgment was based upon the "erroneous impression" that Flxible had acquired the Michigan bonded brake company "much earlier" in the 1980s and that "the activity urged by plaintiff in opposition to the original motion * * * could not have occurred before 1989." The court found that the evidence presented did not support a number of appellant's claims, including that: (1) Bendix was the only brand of brake lining used in the Flxible warranty return/core exchange program and (2) Bendix asbestos-free linings were never sold to or used by Flxible. Determining that Burkhart's testimony was insufficient and that "[t]he true state of the record would require a jury to speculate as to whether the brake products being chiseled or ground were Bendix or not and whether they were asbestos free or not," the court concluded that Honeywell was entitled to summary judgment. The trial court explained its reasoning as follows:

> Plaintiff now urges that the only brand of brake lining used in the Flxible brake warranty program (where the grinding referenced in the earlier opinion transpired) was Bendix, citing to the Burkhart deposition at page 116. This page does not support the argument. Plaintiff also argues that Mr. Burkhart stated that Flxible maintained a stock inventory of Bendix brake linings, citing to pp 107:10 – 108:8 and 116:7-16. These pages have nothing to do with that proposition. In response to defendant's argument that Bendix had begun selling asbestos free brake products as early as 1966, plaintiff argues that, according to Mr. Burkhart, Bendix asbestos-free linings were never sold to or used by Flxible, citing pp 78:2-10 and 130:4-9. Again, those pages do not support the argument. * * *

The plaintiff argues that "Mr. Maddy was exposed to asbestos from removal of asbestos containing Bendix brake linings from 1980-1989." However, there is no witness to support this statement other than Mr. Burkhart, who was not at the Loudonville facility from 1981 to 1983, and then worked a different shift from that of plaintiff's decedent for another two years. Mr. Burkhart only had a one hour overlap with Mr. Maddy after returning to Loudonville until 1985. By this time Bendix was marketing its asbestos-free Ultravar line and by 1988, all of its products were asbestos free. Thus, the evidence does not permit the inference that all of the Bendix products contained asbestos.

The evidence also does not support the plaintiff's argument that only Bendix brakes were used at Flxible. The parts catalog for the 870 bus called for a Carlisle brake and Mr. Burkhart testified that Flxible would provide a Carlisle product to its customer. Disc., depo. p. 82 Furthermore, he was not certain that all of the linings for the Rockwell brakes were Bendix. Tr. p. 92. In fact, he did not know who manufactured the linings on the Rockwell brakes. Tr. p. 170

Mr. Burkhart is the only product identification witness for the plaintiff. He is unable to testify that all the brake products at the Loudonville facility were Bendix. He is unable to state that all Bendix brakes contained asbestos at the operative time.

The true state of the record would require a jury to speculate as to whether the brake products being chiseled or ground were Bendix or not and whether they were asbestos free or not. Consequently, defendant's motion for summary judgment is granted.

{¶ 63} On May 23, 2019, the trial court entered final judgment as to the claims against Honeywell.

{¶ 64} On June 6, 2019, appellant filed a motion for relief from judgment pursuant to Civ.R. 60(B)(1), (3) and (5), arguing that the trial court, in granting Honeywell's motion for reconsideration and entering summary judgment in favor of Honeywell, had (1) mistakenly disregarded evidence that Bendix asbestos-containing brake linings had been used in the warranty return/core exchange program, (2) relied on misrepresentations by Honeywell's counsel that Honeywell

began manufacturing non-asbestos brake linings for use on buses beginning in 1966 and (3) inequitably viewed the evidence in a light "more favorable" to Honeywell rather than in the light most favorable to appellant. Honeywell opposed the motion, disputing appellant's claims.

{¶ 65} Appellant appealed the trial court's order granting summary judgment to this court and requested a limited remand to the trial court for the trial court to rule on its motion for relief from judgment. This court granted the requested remand. On September 11, 2019, the trial court denied appellant's motion for relief from judgment. Appellant appealed the trial court's denial of her Civ.R. 60(B) motion. This court consolidated the two appeals.

{¶ 66} Appellant raises the following two assignments of error for review:

Assignment of Error I: The trial court erred as a matter of law by granting summary judgment in favor of the defendant.

Assignment of Error II: The trial court abused its discretion by denying the plaintiff's motion for relief from judgment.

**Law and Analysis**

**Motion for Summary Judgment**

{¶ 67} In her first assignment of error, appellant contends that the trial court erred in granting summary judgment in favor of Honeywell. Appellant contends that she presented sufficient evidence of Maddy's exposure to asbestos-containing Bendix brake products to require a jury to decide whether Maddy's exposure to asbestos-containing Bendix brake products was a substantial factor in causing his mesothelioma based on: (1) the drilling, grinding and chiseling of used Bendix brake

linings that were returned to the Loudonville facility under Flxible's warranty return/core exchange program; (2) the riveting of new Bendix brake linings onto the used brake shoes returned under the warranty return/core exchange program and (3) the heavy grinding and chiseling of old, used Bendix brake linings as part of Flxible's bonded brake program.

{¶ 68} Honeywell responds that the trial court properly granted summary judgment in its favor because "plaintiff produced no evidence that Maddy was ever actually exposed to asbestos from Bendix brakes." Honeywell contends that appellant could not establish Maddy was exposed to asbestos from Bendix brake products because Maddy could not show that (1) any of the brakes that were sent to the Loudonville facility under the warranty return/core exchange program or bonded brake program were Bendix brakes, (2) any Bendix brakes that might have been sent to the Loudonville facility under either of these programs contained asbestos or (3) Maddy was "present" when any grinding or chiseling of asbestos-containing brake linings occurred.

### Standard of Review

{¶ 69} We review summary judgment rulings de novo, applying the same standard as the trial court. *Grafton v. Ohio Edison Co.*, 77 Ohio St.3d 102, 105, 671 N.E.2d 241 (1996). We accord no deference to the trial court's decision and conduct an independent review of the record to determine whether summary judgment is appropriate.

{¶ 70} Under Civ.R. 56, summary judgment is appropriate when no genuine issue exists as to any material fact and, viewing the evidence most strongly in favor of the nonmoving party, reasonable minds can reach only one conclusion that is adverse to the nonmoving party, entitling the moving party to judgment as a matter of law. On a motion for summary judgment, the moving party carries an initial burden of identifying specific facts in the record that demonstrate his or her entitlement to summary judgment. *Dresher v. Burt*, 75 Ohio St.3d 280, 292-293, 662 N.E.2d 264 (1996). If the moving party fails to meet this burden, summary judgment is not appropriate; if the moving party meets this burden, the nonmoving party has the reciprocal burden to point to evidence of specific facts in the record demonstrating the existence of a genuine issue of material fact for trial. *Id.* at 293. Summary judgment is appropriate if the nonmoving party fails to meet this burden. *Id.*

### Evidentiary Materials Submitted on Summary Judgment

{¶ 71} As an initial matter, we note that much of the evidentiary materials the parties presented in support of, or in opposition to, summary judgment did not comply with Civ.R. 56(C). Civ.R. 56(C) places strict limitations upon the types of documentary evidence that a party may use in supporting or opposing a motion for summary judgment. Under Civ.R. 56(C), the materials that may be considered on a motion for summary judgment include the pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence and written stipulations of fact. Other types of documents may be introduced as evidentiary

material only through incorporation by reference in a properly framed affidavit. *See, e.g., Zapata Real Estate L.L.C. v. Monty Realty Ltd.*, 8th Dist. Cuyahoga No. 101171, 2014-Ohio-5550, ¶ 25; *Dzambasow v. Abakumov*, 8th Dist. Cuyahoga No. 80621, 2005-Ohio-6719, ¶ 26. Documents submitted on summary judgment which are not sworn, certified or authenticated by affidavit generally have no evidentiary value and may not be considered in deciding whether a genuine issue of material fact remains for trial. *See, e.g., Bank of N.Y. Mellon Trust Co., N.A. v. Unger*, 8th Dist. Cuyahoga No. 97315, 2012-Ohio-1950, ¶ 44; *see also Fisher v. Alliance Mach. Co.*, 192 Ohio App.3d 90, 98-99, 2011-Ohio-338, 947 N.E.2d 1308, ¶ 40 (8th Dist.) ("Civ.R. 56 does not permit a party to submit unauthenticated copies of documents."). Before a deposition transcript can be considered as "legally acceptable evidence for summary judgment purposes": (1) the transcript must be filed with the court or otherwise authenticated; (2) the deponent must sign the deposition transcript or waive signature and (3) there must be a certification by the court reporter before whom the deposition was taken. *Zapata* at ¶ 25, citing *Unger* at ¶ 43.

{¶ 72} The evidentiary materials submitted by the parties on summary judgment in this case included: copies of deposition transcripts that did not include the signature of the deponent, any indication that the deponent had waived signature or any certification of the transcript by the court reporter; deposition transcripts filed without copies of the deposition exhibits — notwithstanding the citation of testimony relating to those exhibits in the parties' summary judgment

briefings — and copies of unauthenticated documents, many of which were undated and/or incomplete on their face.

{¶ 73} However, aside from appellant's objection to the documents Honeywell submitted in its supplement to its original motion for summary judgment — which appellant did not raise or renew when opposing Honeywell's motion for reconsideration or on appeal — since neither party objected to the form of the evidence submitted by the other, such evidence could be considered by the trial court in ruling on Honeywell's motion for summary judgment and motion for reconsideration within the court's discretion. *See, e.g., Zapata* at ¶ 27; *Dzambasow*, 2005-Ohio-6719, at ¶ 27 ("'[I]f the opposing party fails to object to improperly introduced evidentiary materials, the trial court may, in its sound discretion, consider those materials in ruling on the summary judgment motion.'"), quoting *Christe v. GMS Mgmt. Co., Inc.*, 124 Ohio App.3d 84, 90, 705 N.E.2d 691 (9th Dist.1997); *Papadelis v. First Am. Sav. Bank*, 112 Ohio App.3d 576, 579, 679 N.E.2d 356 (8th Dist.1996) ("'When ruling on a motion for summary judgment, a trial court may consider documents other than those specified in Civ.R. 56(C) in support of the motion when no objection is raised by the party against whom the motion is directed.'"), quoting *Rodger v. McDonald's Restaurants of Ohio, Inc.*, 8 Ohio App.3d 256, 456 N.E.2d 1262 (8th Dist.1982), paragraph one of the syllabus.

### Requirements for Asbestos-Related Injury Claims

{¶ 74} To prevail on a claim for asbestos-related injuries, a plaintiff must prove, by a preponderance of the evidence, that (1) he or she was "exposed to

asbestos" that was "manufactured, supplied, installed, or used by the defendant" and (2) the plaintiff's exposure to the defendant's asbestos-containing product was a "substantial factor" in causing the plaintiff's asbestos-related injuries. R.C. 2307.96(B); *Schwartz v. Honeywell Internatl., Inc.*, 153 Ohio St.3d 175, 2018-Ohio-474, 102 N.E.2d 477, ¶ 1.

{¶ 75} What constitutes a "substantial factor" is not specifically defined in the statute. *Schwartz* at ¶ 14. However, R.C. 2307.96(B) provides that "[i]n determining whether exposure to a particular defendant's asbestos was a substantial factor in causing the plaintiff's injury or loss, the trier of fact in the action shall consider, without limitation, all of the following":

> (1) The manner in which the plaintiff was exposed to the defendant's asbestos;
>
> (2) The proximity of the defendant's asbestos to the plaintiff when the exposure to the defendant's asbestos occurred;
>
> (3) The frequency and length of the plaintiff's exposure to the defendant's asbestos;
>
> (4) Any factors that mitigated or enhanced the plaintiff's exposure to asbestos.

{¶ 76} In asbestos-related tort actions, summary judgment is appropriate "'[w]here specific evidence of frequency of exposure, proximity and length of exposure to a particular defendant's asbestos is lacking * * * because such a plaintiff lacks any evidence of an essential element necessary to prevail.'" *Schwartz* at ¶ 13, quoting Am.Sub.H.B. No. 292, Section 5, 150 Ohio Laws, Part III, 3970, 3993. "[M]erely placing a defendant's asbestos product" in the plaintiff's workplace "is not

enough" to survive summary judgment — at least where the workplace is "immens[e]." *Fisher*, 192 Ohio App.3d 90, 2011-Ohio-338, 947 N.E.2d 1308, at ¶ 47, 52-53. "To support a reasonable inference of substantial causation from circumstantial evidence, there must be evidence of exposure to a specific product on a regular basis over some extended period of time in proximity to where the plaintiff actually worked." *Lohrmann v. Pittsburgh Corning Corp.*, 782 F.2d 1156, 1162-1163 (4th Cir.1986); *Schwartz* at ¶ 12-13 (indicating that the legislature "adopt[ed]" the *Lohrmann* test in "establish[ing] specific factors to be considered in determining whether exposure to asbestos from a particular defendant's product was a substantial factor in causing a plaintiff's asbestos-related disease" under R.C. 2307.96(B)).

{¶ 77} Following a thorough, independent review of the stipulated record, construing the evidence presented (as it relates to Honeywell's motion for summary judgment and motion for reconsideration) in the light most favorable to appellant, we find that genuine issues of fact exist (1) as to whether Maddy was exposed to asbestos-containing Bendix brake products while working at the Loudonville facility and, if so, (2) whether Maddy's exposure to those asbestos-containing products was of a sufficient manner, proximity, frequency and duration to be a substantial factor in causing his mesothelioma.

**Evidence of Maddy's Exposure to Asbestos-Containing Bendix Brake Products**

{¶ 78} At the outset, Honeywell argues that the court should disregard or discount Burkhart's testimony regarding Maddy's exposure to Bendix products prior to the mid-1980s. Honeywell contends that Burkhart worked with Maddy for no more than "one or two hours" a day "until at least 1985 or 1986" and, therefore, lacked a sufficient basis to testify regarding Maddy's occupational exposure to asbestos-containing products during that time. We disagree.

{¶ 79} Burkhart testified that he first met Maddy when Maddy became his supervisor in 1980 and that he was familiar with Maddy's job duties and responsibilities during the entire time they both worked for Flxible. Burkhart testified that he and Maddy worked in the same department, that Burkhart "took [his] directions" from Maddy, that Burkhart, at times, worked overtime, extending the number of hours he worked with Maddy and that Maddy continued to serve as his supervisor even while Burkhart worked at the Ontario facility. A sufficient foundation was laid for Burkhart to testify regarding the products Maddy worked with or around at the Loudonville facility. Honeywell's criticisms go to the weight to be given Burkhart's testimony, which is not a proper consideration on summary judgment. *See, e.g., Allen v. Pirozzoli*, 8th Dist. Cuyahoga No. 103632, 2016-Ohio-2645, ¶ 22 ("'[W]hen reviewing a motion for summary judgment, a court must be careful not to weigh the evidence or judge the credibility of witnesses. * * * Instead, it must consider all of the evidence and reasonable inferences that can be drawn

from the evidentiary materials in favor of the nonmoving party.'"), quoting *Wheeler v. Johnson*, 2d Dist. Montgomery No. 22178, 2008-Ohio-2599, ¶ 28.

**The Warranty Return/Core Exchange Program**

{¶ 80} In its decision granting Honeywell's motion for reconsideration, the trial court confuses the evidence relating to what it describes as the "Flxible brake warranty program" (also known as the warranty return/core exchange program) with the bonded brake program. The trial court states: "Plaintiff now urges that the only brand of brake lining used in the Flxible brake warranty program (where the grinding referenced in the earlier opinion transpired) was Bendix." It was, however, evidence relating to the bonded brake program (specifically, Burkhart's testimony from his first and second depositions) that was the basis of the trial court's "earlier opinion," i.e., the trial court's decision denying Honeywell's motion for summary judgment.

{¶ 81} As it relates to Flxible's warranty return/core exchange program, appellant contends that Maddy was exposed to asbestos from Bendix brake linings when (1) used asbestos-containing Bendix brake linings were "drilled, ground and chiseled into dust" as they were being removed and (2) new asbestos-containing Bendix brake linings were riveted onto the used brake shoes returned under the warranty return/core exchange program. This work occurred in Department 52.

{¶ 82} Honeywell contends that appellant cannot establish that Maddy was exposed to asbestos from Bendix brake products in connection with the warranty return/core exchange program because: (1) Burkart could not identify Bendix as the

manufacturer of any of the used brake linings returned to the Loudonville facility; (2) there was no evidence that the new Bendix brake linings installed as part of the warranty return/core exchange program were manufactured with processed chrysotile fibers and (3) there was no evidence Maddy "was present" when any of the work related to the warranty return/core exchange program was being performed in Department 52.

{¶ 83} The parties dispute whether Burkhart testified that he could not identify the manufacturer of any of the used brakes or brake linings that were returned to the Loudonville facility under the warranty return/core exchange program. Their disagreement revolves around the interpretation of the following series of exchanges from Burkhart's third deposition:

> Q.   [by Honeywell's counsel] Now, do you know, these shoes that were returned, were these shoes that were original equipment on the buses that were in Chicago, or do you have any way of knowing?
>
> A.   I wouldn't have known if they were used shoes, if they — if they just decided there was too many shoes to replace with their workers that they just bought the shoes and we were giving them a core.
>
> Q.   Okay.
>
> A.   It is kind of like what you get when you go to Auto Zone.
>
> Q.   So with respect to the manufacturer of these brakes, these worn brakes that you received from Chicago, is there any way for you to identify the manufacturer of that brake?
>
> A.   No.
>
> * * *

Q.     [by Honeywell's counsel] * * * [W]ith respect to any linings that were on any of these worn — cores that were returned, you would have no way of identifying who the manufacturer of — manufacturer was of those linings?

A.     Of the few that I seen, I really couldn't say, you know.

       * * *

Q.     [by appellant's counsel] * * * And in your memories from doing this work [referring to the warranty return/core exchange program] where you would have to use your hands and count these brake shoes, do you recall ever seeing, as you've testified previously in your other depositions, the insignia on the side of those brake shoes?

       * * *

A.     Well, they would be, if there was some still left, it might — yeah, there would be insignias.

Q.     And as you told us, or let me just ask you directly, what would you see if it was a Bendix brake lining?

       * * *

A.     Well, you would have your Bendix logo on it.

Q.     Do you recall what that logo might have been?

A.     It was kind of a square with a B.

       * * *

Q.     [by Honeywell's counsel] * * * You were asked some questions by [appellant's counsel] about, did you ever see any Bendix logos on any of the cores that came back.  Sitting here today, do you have a recollection of ever seeing a Bendix logo on any of those cores that came back through the warranty program?

       * * *

A.     It's one of them things that you're looking at 30, 40 years.

Q. Okay. Would you be able to estimate how many times you ever saw a Bendix logo on any of those cores that you personally observed while you were in the warranty program?

A. No. I couldn't tell you.

{¶ 84} Honeywell contends that Burkhart testified that he could not identify the manufacturer of any of the used brakes or worn brake linings that were returned under the program. Appellant maintains that Burkhart testified that he, in fact, saw "Bendix logos" on some of the used brakes returned to Loudonville under the warranty return/core exchange program.

{¶ 85} Having reviewed Burkhart's three deposition transcripts in their entirety, we find Burkhart's testimony on this issue to be ambiguous. On summary judgment, a court cannot resolve ambiguities in the evidence presented but must, instead, construe the evidence in the light most favorable to the nonmoving party. *See, e.g., Rickels v. Goyings*, 3d Dist. Paulding No. 11-07-09, 2008-Ohio-2119, ¶ 10.

{¶ 86} Even if, however, Burkhart had not personally seen Bendix logos on some of these used brakes, Burkhart testified that the used cores were "returned" to Flxible as part of its *warranty* return/core exchange program, i.e., that the "core exchange" was a component or extension of its warranty. He testified that upon receipt, returned used brake cores were examined to confirm that they met the requirements of the program.

{¶ 87} Burkhart testified that Bendix brake linings were original equipment on Flxible buses during the 1980s, that Flxible stocked only Bendix brake linings prior to 1990 and that the Rockwell preassembled brakes Flxible sold in the 1980s

used Bendix brake linings. Although there is no evidence in the record that used brake cores accepted under the warranty return/core exchange program were limited to brakes cores that had not been relined or had been relined with only Bendix brake linings, as a general matter, a company does not "warrant" a product it does not manufacture or sell. Further, Burkhart testified that some of the transit authorities who participated in the warranty return/core exchange program, including transit authorities from Jamaica and Syracuse, New York, did not reline their own brakes. Once the brake linings were worn, those transit authorities simply sent the brake shoes back to Loudonville to "get some credit on it." Construing the evidence in the light most favorable to appellant, a jury could reasonably infer that used brakes with worn brake linings that were returned to Flxible under its warranty return/core exchange program included brakes with Bendix brake linings.

{¶ 88} In addition, Burkhart testified that every used brake core that was returned pursuant to the warranty return/core exchange program was relined with brake linings from Flxible's stock. Burkhart testified that until Flxible initiated its bonded brake program in 1989, brakes were relined by riveting new brake linings onto the old brake shoes. Burkhart further testified that until 1990, only Bendix brake linings were stocked at the Loudonville facility.

{¶ 89} Honeywell asserts that Burkhart "conceded" that Flxible "may have sold other manufacturers' brake linings for use on its buses" when questioned regarding an excerpt from what it describes as a "1983 Flxible Parts Catalog." Honeywell contends that the catalog "indicates that Carlisle brakes were sold by

Flxible as early as 1983."[12]  The catalog excerpt references a part for the "front axle assembly" identified as "Kit-Lining, 14-1/2 x 6" HD8 x SM14-Carlisle, Consists of Linings, Bolts, Nut, Lockwasher and Plugs for (1) Axle."  Burkhart did not recall seeing the catalog when he worked at Flxible, but, when questioned regarding it, he testified that it was possible that parts could have been ordered from Flxible and shipped directly from the parts manufacturer to the transit company.

{¶ 90} Burkhart, however, maintained that no Carlisle linings or linings manufactured by any other manufacturer were in stock at the Loudonville facility until 1990.  Burkhart began working in the warehouse in 1978.  He testified that it was his job to keep an inventory of the brake linings that came into the facility and that he "knew [the] stock really, really well."  Even if some adverse inference could be drawn from the "Flxible parts catalog" excerpts, it bears repeating that this case involves a motion for summary judgment.  On matters of summary judgment, we are required to construe the evidence in the light most favorable to the nonmoving party.  To the extent that the catalog excerpts may be inconsistent with Burkhart's

---

[12] Although Honeywell refers to this document as a "1983 Flxible Parts Catalog," it is unclear from the record how it determined that this catalog was from 1983.  The copy of the document in the record is incomplete, and there is nothing that we see in the portions of the document included in the record that identifies it as having been printed or circulated in 1983.  Further, although Honeywell asserts that "[t]his parts catalog establishes that the part number for the brake linings on the 870/Metro Flxible Bus, the only bus being sold by Flxible since 1978, called for a Carlisle brake," this assertion goes well beyond what is indicated in the document.  For example, "Carlisle" is referenced in the document only with respect to the "front axle assembly," not the "rear axle assembly," and there is nothing in the document to suggest that all buses sold by Flxible since 1978 "called for a Carlisle brake."

testimony, we must credit Burkhart's testimony over whatever inferences might potentially be drawn from the catalog.

{¶ 91} Further, contrary to the trial court's assertion, it was not necessary that Burkhart be able to testify regarding the asbestos content of Bendix products to survive summary judgment. Appellant presented evidence produced by Honeywell from which a jury could draw reasonable inferences regarding the asbestos content of Honeywell's brake products "at the operative time." Based on the evidence presented, a jury could reasonably infer that, through at least the mid-1980s (and perhaps longer), the used Bendix brakes returned to the Loudonville facility under the warranty return/core exchange program and the new Bendix brake linings that were riveted onto the old brake shoes as part of that program — 400 to 500 brakes a year — contained asbestos.

{¶ 92} Although the trial court states in its decision that "Bendix had begun selling asbestos free brake products as early as 1966," Honeywell's discovery responses and the testimony of its corporate representative indicate that the asbestos-free brake blocks introduced in the 1960s were for a particular application, i.e., logging and mining trucks, not the application at issue here.

{¶ 93} As detailed above, the record reflects that Honeywell did not begin manufacturing asbestos-free brake linings or brake blocks for this application until 1983, at the earliest, and that, by 1983, only 5 percent of Bendix brake blocks were asbestos-free. Although Honeywell presented evidence that it began manufacturing asbestos-free Ultravar brand brake blocks in 1983, Burkhart was not asked about

Ultravar brand brake blocks during any of his three depositions and there is no other evidence that Ultravar brand brake blocks were used at Flxible.

{¶ 94} The record further reflects that Honeywell manufactured both asbestos-free and asbestos-containing Bendix brake blocks through 1988,[13] that Honeywell manufactured both asbestos-free and asbestos-containing Bendix brake linings through 2001 and that the average percentage of processed chrysotile asbestos fiber in those asbestos-containing products was 35 percent and 50 percent, respectively.

{¶ 95} Appellant also presented evidence from which it could be reasonably inferred that the used brake linings that were ground and chiseled as part of the bonded brake program in 1989 included asbestos-containing Bendix brake linings. Burkhart testified that he saw Bendix brakes in the baskets of brakes that were acquired from the Michigan facility in or around October 1988. Given that these linings were used and given the dates (1) when Bendix began manufacturing asbestos-free Bendix brake blocks and brake linings and (2) when it stopped manufacturing asbestos-containing Bendix brake blocks and brake linings, a jury could reasonably find that it was more likely than not that the used Bendix brakes ground and chiseled as part of the bonded brake program contained asbestos. Burkhart's testimony that Maddy told Burkhart he had been told in a meeting the

_____

[13] Although Honeywell asserts in its brief that "[b]y 1988, Bendix no longer manufactured brake blocks with processed chrysotile," Honeywell stated in its discovery responses that it "manufactured and sold" asbestos-containing Bendix brand brake linings "from 1939 to 2001" and Bendix brand brake blocks "from 1948 to 1988." It further stated that these products contained chrysotile asbestos.

used brakes received from the Michigan facility did not contain asbestos would not preclude a jury from reasonably inferring that these Bendix brake products contained asbestos.

**Evidence of R.C. 2307.96(B) Factors**

{¶ 96} Honeywell argues that even if appellant presented sufficient evidence that asbestos-containing Bendix brake linings were ground, chiseled, drilled or riveted at the Loudonville facility in connection with its warranty return/core exchange program or bonded brake programs, it was still entitled to summary judgment because appellant could not establish that Maddy was "present" when any of the grinding, chiseling, drilling or riveting of these asbestos-containing Bendix brake linings occurred. Honeywell contends that the evidence of exposure in this case is "similar" to that rejected by the Ohio Supreme Court in *Schwartz v. Honeywell Internatl., Inc.*, 153 Ohio St.3d 175, 2018-Ohio-474, 102 N.E.2d 477, and that the trial court's decision granting summary judgment should be affirmed on that basis. Once again, we disagree.

{¶ 97} In *Schwartz*, the plaintiff, a widower, brought an action on behalf of himself and his wife's estate. He alleged that his wife had died from mesothelioma due to secondary exposure through her father's exposure to asbestos from multiple sources. The case proceeded to a jury trial. At trial, the plaintiff presented evidence that the decedent "might have been exposed" to asbestos fibers from Bendix brake products when she walked through the garage while her father was installing new asbestos-containing Bendix brakes on the family's cars or had contact with her

father's clothes after a brake job. *Id.* at ¶ 3. The decedent's father had changed the brakes in the family's cars in the garage of the family home 5-10 times during the 18 years the decedent lived there. The decedent and her siblings would walk through the garage to access the backyard when they went out to play. *Id.* at ¶ 5. When she was old enough, the decedent helped with the family's laundry, which "may have included" the clothes the father had been wearing while changing brakes. *Id.*

{¶ 98} Evidence was also presented that the decedent was exposed to asbestos from other manufacturers' products due to her father's full-time employment as an electrician. Her father testified that he was regularly exposed to "clouds of asbestos dust" while at work and that he would drive the family car home, pick the decedent up from school and play with his children after work without changing out of his work clothes. The decedent's mother testified that the decedent helped wash her father's work clothes. *Id.* at ¶ 6.

{¶ 99} The plaintiff's causation expert opined that decedent's exposures to Bendix brakes and to asbestos dust brought home from her father's electrician job were both "contributing factors" to her "total cumulative dose" of asbestos exposure and that her "cumulative" exposure "was the cause of her mesothelioma." *Id.* at ¶ 7, 16. He did not opine that the decedent's exposure to asbestos fibers from Bendix brakes was a substantial factor in causing her disease. *Id.* at ¶ 16.

{¶ 100} Honeywell moved for a directed verdict, arguing that the plaintiff had failed to demonstrate that the decedent's exposure to asbestos from Bendix brakes was a substantial factor in causing her disease. *Id.* at ¶ 8. The trial court

denied the motion and the jury found Honeywell five percent responsible for the defendant's injuries. *Id.* On appeal, this court affirmed the trial court's denial of Honeywell's motion for a directed verdict. *Id.* at ¶ 9. The Ohio Supreme Court accepted Honeywell's discretionary appeal. Concluding that the motion for directed verdict should have been granted, the Ohio Supreme Court reversed this court's decision and entered judgment in favor of Honeywell. *Id.* at ¶ 2, 10, 30.

{¶ 101} The "primary question" addressed in *Schwartz* was whether the substantial factor requirement could be met through the plaintiff's expert's cumulative exposure theory, i.e., a theory that "postulates that every nonminimal exposure to asbestos is a substantial factor in causing mesothelioma" because it contributes to the cumulative exposure.[14] *Id.* at ¶ 1, 17. The court rejected use of the cumulative exposure theory in that case, concluding that the theory was "incompatible" and "at odds with" R.C. 2307.96. The court explained:

> Requiring only that the plaintiff demonstrate that the exposure to asbestos from the defendant's product was nonminimal and contributed to the plaintiff's total cumulative exposure is inconsistent with the statutory requirement that the plaintiff prove—based on the manner, proximity, frequency, and length of exposure — that a

---

[14] The court further explained:

Underlying the cumulative-exposure theory are two predicates. First, * * * there is no known threshold of asbestos exposure "at which mesothelioma will not occur." Second, "it is impossible to determine which particular exposure to carcinogens, if any, caused an illness. In other words, * * * the cumulative exposure theory does not rely upon any particular dose or exposure to asbestos, but rather all exposures contribute to a cumulative dose." *Krik v. Exxon Mobil Corp.*, 870 F.3d 669, 677 (7th Cir. 2017).

*Id.* at ¶ 17.

particular defendant's conduct was a substantial factor in causing the injury.

*Id.* at ¶ 23.

{¶ 102} In *Schwartz,* the court also considered whether the plaintiff had presented sufficient evidence at trial that the decedent's exposure to Bendix brakes was a substantial factor in her contracting mesothelioma under R.C. 2307.96. In concluding that the plaintiff lacked sufficient evidence to prove that the decedent's exposure to Bendix brakes was a substantial factor in her contracting mesothelioma, the court observed that plaintiff's causation expert had not testified that the decedent's exposure to Bendix brakes was a substantial factor in causing her disease and that "the other evidence offered about [the decedent's] exposure to Bendix products was likewise insufficient to establish causation" based on the factors specified in R.C. 2307.96. *Id.* at ¶ 25-26. The court held that the evidence "merely" showed that the decedent "could have been exposed" to asbestos from Bendix products when her father installed Bendix brakes on five to ten occasions and did not show that the decedent was exposed to asbestos from Bendix products "'on a regular basis over some extended period of time.'" *Id.* at ¶ 27, quoting *Lohrmann,* 782 F.2d at 1162-1163.

{¶ 103} The court further held that, in determining whether the decedent's exposure to asbestos from Bendix brakes was a substantial factor in causing her injury, the "limited and irregular exposures" to asbestos that the decedent "might have had" as a result of her father's "occasional brake jobs" had to be considered "in

the context of her exposures to asbestos from the products of other manufacturers." *Schwartz* at ¶ 28. The court noted that when working as an electrician, the decedent's father "came into contact with [other] products containing asbestos nearly every day he worked — five to seven days a week, 10 to 12 hours a day — for 33 years" and that the decedent had regular contact with her father after work before he changed his clothes and that she also washed his work clothes. *Id.* The court stated that "when we consider the manner, proximity, frequency, and duration of [the decedent's] exposures to asbestos from Bendix products in relation to these 'other factors which contribute in producing the harm,' we cannot conclude that [the plaintiff] established that [the decedent's] exposure to asbestos from Bendix products was a substantial factor in causing her mesothelioma." *Id.* at ¶ 29, quoting 2 Restatement of the Law 2d, Torts, Section 433, at 432.

{¶ 104} Although the court found that the evidence in *Schwartz* was insufficient to allow the jury to decide if the decedent's exposure to Bendix brakes was a substantial factor in causing the decedent's asbestos-related injury, it did not indicate what evidence would be sufficient to go to a jury on the issue.

{¶ 105} This case is distinguishable from *Schwartz.* First, as stated above, the sufficiency of the expert evidence presented in support of appellant's claims is not at issue in this appeal. Second, unlike *Schwartz*, this is not a case in which there is evidence of the decedent's exposure to multiple (and more significant) sources of asbestos beyond the defendant's products at issue. In this case, there is no specific evidence of Maddy's exposure to any other asbestos-containing products to consider

when determining whether Maddy's exposure to Bendix brake products was a substantial factor in causing his mesothelioma. On summary judgment, it cannot simply be assumed that Maddy was exposed to asbestos from other sources, particularly given Burkhart's testimony that Flxible began taking steps to remove asbestos from the workplace in 1973, many years before Burkhart began working at the Loudonville facility.

{¶ 106} Finally, a plaintiff may prove exposure through circumstantial evidence and reasonable inference. *See, e.g., Cantrell v. Adience, Inc.*, 8th Dist. Cuyahoga No. 93944, 2010-Ohio-3614, ¶ 21. In this case, the evidence of the manner, proximity, frequency and duration of Maddy's likely exposure to Bendix asbestos-containing brake products is much more substantial than that of the decedent in *Schwartz*. In *Schwartz*, there was no evidence that the decedent had ever actually walked through the garage any of the five to ten times her father had performed a brake job or that she had actually washed the clothes he had been wearing after he had performed a brake job. Rather, the plaintiff claimed that such exposures were "likely to have occurred" based on what "typically" happened.

{¶ 107} In this case, Burkhart testified that the work in grinding, chiseling, drilling and/or riveting of old and new brake linings in connection with the warranty return/core exchange program — on 400 to 500 brakes each year — was done on the first and second shifts. This work was not done every day and there is no evidence that when it was done, it was done all day, throughout the entire first and second shifts, or during the entire time from 6:00 a.m. to 8:00 p.m. when Maddy

generally worked. However, Burkhart testified that Maddy passed by the area in which this work was performed every day, two-three times a day, for many years, on his way to meet with his supervisor. He further testified that, at times, Maddy did not simply pass by the area, but stopped and chatted with the workers or their supervisor. From at least 1980 through 1983 (and likely much longer) the Bendix brake products to which Maddy would have been exposed when he was in, or passed by, the work area would have contained asbestos. The area in which this work was being performed was not sealed off from the rest of Department 52.[15] Maddy

<hr>

[15] Honeywell contends that Burkhart testified that he never saw Maddy around any dust from work performed in Department 52. In support of this contention, Honeywell points to testimony from Burkhart's third deposition. Once again, however, we find that Burkhart's testimony regarding this issue is ambiguous. In his third deposition, Burkhart stated, in response to a question regarding what he had testified to previously (where there had been no discussion of the warranty return/core exchange program):

Q.     And at your — one of your last depositions, you indicated that with respect to Mr. Maddy being around dust, your recollection of him being around brake dust was only with respect to that timeframe in which the brakes were being ground off in that plastic enclosed area in Plant 8; is that correct?

A.     Other than just a little bit of that short time when we were just making the adaptions for them to fit. * * * But that didn't raise that much dust. * * *

Q.     And when you're talking about the dust for the adaptions, these are with respect to the finished bonded brakes, correct?

A.     Right.

Even if Burkhart had testified that he had not seen Maddy around any dust in connection with the work performed in Department 52, that would simply be a matter for the jury to consider in resolving the factual issues in this case. Burkhart also testified that the drilling, grinding and chiseling necessary to remove brake lining material from the used brake cores created debris and dust.

did not wear a mask or other protective gear as he passed through the area each day.[16]

{¶ 108} Further, as detailed above, appellant also presented evidence that would permit an inference that, for a period of up to three to six months in 1989, Maddy was exposed to asbestos dust from the grinding and chiseling of used Bendix brake linings on the old brake shoes that had been acquired when Flxible purchased the Michigan facility in October 1988 in connection with the bonded brake program. Maddy supervised this work and "continuously" went "in and out" of the work area while this work was going on.

{¶ 109} This is not a case involving a "'mere assertion'" that "'the plaintiff had worked in the vicinity of a product containing asbestos.'" *See, e.g., Rahmes v. Adience, Inc.*, 8th Dist. Cuyahoga No. 88427, 2007-Ohio-4298, ¶ 7, quoting *Vince v. Crane Co.*, 8th Dist. Cuyahoga No. 87955, 2007-Ohio-1155, ¶ 13. Likewise, this is not a case in which the plaintiff has made "a mere showing that the defendant's product was present somewhere at [the] plaintiff's place of work." *See, e.g., Lindstrom v. A-C Prod. Liab. Trust,* 424 F.3d 488, 492 (4th Cir.2005).

{¶ 110} Considering the stipulated summary judgment record in its entirety, and construing the evidence in the light most favorable to appellant, we cannot say that this is a case "'[w]here specific evidence of frequency of exposure, proximity and

---

[16] Honeywell did not assert in its motion for summary judgment or its motion for reconsideration that there was no genuine issue of material fact that Maddy could not have been exposed to asbestos fibers from being in or near the area while this work was performed. Accordingly, we do not address that issue here.

length of exposure to a particular defendant's asbestos is lacking,'" *Schwartz* at ¶ 13, quoting Am.Sub.H.B. No. 292, Section 5, 150 Ohio Laws, Part III, 3970, 3993.  We find that through Burkhart's testimony, appellant presented specific evidence relevant to a determination of each of the R.C. 2903.76(B) factors — manner, proximity, frequency, length of exposure and mitigating and enhancing factors — to require a jury to determine whether Maddy's exposure to Honeywell's Bendix brake products was a substantial factor in causing his mesothelioma.  In reaching this conclusion, we are mindful that R.C. 2307.96(B) states that it is the "trier of fact" who "shall consider" the specified R.C. 2307.96(B) factors and "determin[e] whether exposure to a particular defendant's asbestos was a substantial factor in causing the plaintiff's injury or loss."  It is not the role of this court (or the trial court) to weigh the evidence relevant to those factors.

{¶ 111} The trial court granted summary judgment in this case because it found that Burkhart, the only product identification witness for appellant, was "unable to testify" that "*all* the brake products at the Loudonville facility were Bendix" and that "*all* Bendix brakes contained asbestos at the operative time." (Emphasis added.)  However, this is not what appellant was required to show to survive summary judgment.  To survive summary judgment, appellant needed to present evidence from which a jury could reasonably infer that Maddy was exposed to asbestos-containing Bendix brake products while working at the Loudonville facility and that Maddy's exposure to those asbestos-containing products was of a sufficient manner, proximity, frequency and duration to be a substantial factor in

causing his mesothelioma. Based on the record before us, we find that genuine issues of material fact exist as to these elements of appellant's claims. Accordingly, the trial court erred in granting Honeywell's motion for reconsideration and entering summary judgment in favor of Honeywell.

{¶ 112} We sustain appellant's first assignment of error. Based on our resolution of appellant's first assignment of error, her second assignment of error is moot.

{¶ 113} Judgment reversed; remanded.

It is ordered that appellant recover from appellee the costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate be sent to the Cuyahoga County Common Pleas Court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
EILEEN A. GALLAGHER, JUDGE

EILEEN T. GALLAGHER, A.J., and
MICHELLE J. SHEEHAN, J., CONCUR